Willia WELLS, Margarete Yung, Doris & Willard Maytubby, Willie Ruth Hunter, et al., Appellants,

v.

The MISSOURI PROPERTY INSURANCE PLACEMENT FACILITY, d/b/a Missouri Fair Plan, Respondent.

No. 63984.

Supreme Court of Missouri, En Banc.

June 30, 1983.

Stuart R. Berkowitz, Clayton, for appellants.

Glenn E. McCann, Edward L. Smith, Kansas City, Joseph L. Leritz, St. Louis, for respondent.

WELLIVER, Judge.

The issue in this case is the effect of the valued insurance policy statutes, §§ 379.-140–.145, .160, RSMo 1978,[1] and § 379.150 on claims filed on policies issued under the Missouri FAIR Plan.[2]

I

Appellants brought this action in the form of a two-count class action. In Count I appellants Willia Wells, Margarete Yung, and Doris and Willard Maytubby alleged that they each owned real property, and appellant Willie Ruth Hunter alleged that she owned personal property, that had been insured by respondent against fire loss.

---

1. All statutory references are to RSMo 1978 unless otherwise indicated.

2. "FAIR" is an acronym for "fair access to insurance requirements."

The property of each sustained partial loss due to fire.[3] They claimed that in determining the amount to be paid on their fire insurance claims respondent improperly deducted depreciation from the cost of repair of the property. Such a deduction, it was alleged, violated § 379.150, which provides:

> Whenever there is a partial destruction or damage to property covered by insurance, it shall be the duty of the party writing the policies to pay the assured a sum of money equal to the damage done on the property, or repair the same to the extent of such damage, not exceeding the amount written in the policy, so that said property shall be in as good condition as before the fire, at the option of the insured.

They sought recovery of the deducted amount on the ground that they were entitled to receive the cost of repair and that by deducting depreciation from that amount respondent, in violation of the valued policy statutes, "in essence ... denied the subject property was worth the full amount for which it was insured." *See* § 379.140. They also sought certification of a class of plaintiffs from whose claims for partial loss respondent had deducted depreciation. For the class they sought actual damages in the amount of such depreciation and punitive damages of $15 million.

In Count II appellant James Smith alleged that he had owned real and personal property insured by respondent against fire loss and that the property had been totally destroyed by fire. The real property was insured for $10,000 and the personal property for an aggregate sum of $4,000. Smith claimed that the "cost of repairing [his] property greatly exceeded the amount of $10,000.00 for which it was insured and little or no depreciation had occurred in the three months between the time the policy

had been issued and the time of the fire." He alleged that as a result he was entitled under § 379.140 to receive $10,000.[4] Section 379.140 provides:

> In all suits brought upon policies of insurance against loss or damage by fire hereafter issued or renewed, the defendant shall not be permitted to deny that the property insured thereby was worth at the time of the issuing of the policy the full amount insured therein on said property; and in case of total loss of the property insured, the measure of damage shall be the amount for which the same was insured, less whatever depreciation in value, below the amount for which the property is insured, the property may have sustained between the time of issuing the policy and the time of the loss, and the burden of proving such depreciation shall be upon the defendant; and in case of partial loss, the measure of damage shall be that portion of the value of the whole property insured, ascertained in the manner prescribed in this chapter, which the part injured or destroyed bears to the whole property insured.

Smith claimed that respondent erroneously deducted depreciation "in excess of that which may have occurred between the time the policy was issued and the time of the loss," and he sought actual damages for the difference between the face value of the policy insuring the real property and the amount he was actually paid. He also sought certification of a class of plaintiffs from whose claims for total loss respondent had deducted excess depreciation. For the class he sought actual damages in the amount of such excess depreciation and punitive damages of $15 million.

The trial court sustained respondent's motion to dismiss for failure to state a

---

3. Hunter also owned real property that was totally destroyed. She does not contest the $7,500 respondent paid her for that loss.

4. The petition is silent with regard to the personal property insured for $4,000. It is unclear whether the payment Smith received from respondent was intended to indemnify Smith for the loss of both the personal and real property,

whether a separate settlement was made for the personal property, or whether Smith has made no claim at all regarding the personal property. Count II is founded upon § 379.140, which applies only to real property. *Duckworth v. United States Fidelity & Guar. Co.,* 452 S.W.2d 280, 282 (Mo.App.1970); § 379.-145(2).

claim upon which relief could be granted, see Rule 55.27(a)(6), and appellants appealed. The Missouri Court of Appeals, Eastern District, adopted an opinion affirming the dismissal of Count I but reversing the dismissal of Count II. We ordered the case transferred, Rule 83.03, and we review as if on original appeal, Rule 83.09. We affirm the judgment of the trial court in all respects.[5]

## II

■ Under the valued policy statutes an insurer is estopped to deny that the value of insured property at the time the policy was written was equal to the amount of insurance for which the policy was written. *See* §§ 379.140–.145, .160. Sections 379.140 and 379.145 apply only to real property, and § 379.160 applies to both real and personal property. *Duckworth v. United States Fidelity & Guaranty Co.,* 452 S.W.2d 280, 282–85 (Mo.App.1970). Section 379.-140, quoted above, establishes as the measure of damages for a total loss of real property[6] the face value of the policy less the amount the property depreciates between the time the policy is issued and the time of the casualty. The insurer bears the burden of proving such depreciation, and absent such proof the amount of the policy conclusively establishes the value of the property. *See State ex rel. North British & Mercantile Insurance Co. v. Cox,* 307 Mo. 194, 201, 270 S.W. 113, 115 (banc 1925);

*Meyer v. MFA Mutual Insurance Co.,* 543 S.W.2d 822, 827 (Mo.App.1976).

■ Section 379.140 also establishes a measure of damages for the partial loss of real property, but our courts have largely ignored that provision and have instead relied on § 379.150, quoted above, for the measure of damages in the case of a partial loss without regard to whether the property is real or personal. Section 379.150 allows the insured to receive "a sum of money equal to the damage done on the property" or to have the insurer repair the property "to the extent of such damage." There is no express indication of how "the damage done on the property" is to be calculated, but our courts have long held that under that section and its predecessors damages are to be measured by the difference between the reasonable values of the property immediately before and immediately after the casualty. *E.g., Non-Royalty Shoe Co. v. Phoenix Assurance Co.,* 277 Mo. 399, 416–19, 210 S.W. 37, 40–41 (1918); *Franklin v. Farmers Mutual Insurance Co.,* 627 S.W.2d 110, 113 (Mo.App.1982); *Boren v. Fidelity & Casualty Co.,* 370 S.W.2d 706, 709 (Mo.App. 1963); *Brown v. Pennsylvania Fire Insurance Co.,* 263 S.W.2d 893, 899 (Mo.App. 1954); *Johnstone v. Home Insurance Co.,* 34 S.W.2d 1029, 1033 (Mo.App.1931); *Security Printing Co. v. Connecticut Fire Insurance Co.,* 209 Mo.App. 422, 448, 240 S.W. 263, 271 (1922); *Scism v. Home Insurance Co.,* 224 S.W. 48, 49 (Mo.App.1920); *Tinsley v. Aetna Insurance Co.,* 199 Mo.App. 693, 708, 205

---

**5.** The additional briefs the parties filed in this Court proceed upon the assumption that the case was transferred only to review the judgment regarding Count I. That assumption is erroneous. Certainly we have the authority to limit grants of transfer to a particular question. *See Leehy v. Supreme Express & Transfer Co.,* 646 S.W.2d 786, 787 (Mo. banc 1983) (transfer granted on one of three issues in case). Nothing in Rule 83.03, however, indicates that a *party* may request transfer of only part of a case, and indeed appellants' application to transfer requested "that *this case* be transferred to the Supreme Court for briefs, argument and further proceedings pursuant to Rule 83.-03." (Emphasis added.) Whether we choose to transfer all or only part of a case lies within our discretion as an exercise of our constitutional superintending authority over the courts of this state. *See* Mo. Const. art. V, § 4(1).

Unlike our transfer order in *Leehy,* our order in this case does not limit the grant of transfer.

**6.** The term "total loss" with regard to real property has been held to mean that the building has lost its identity and specific character as a building and become so far disintegrated that it can no longer be designated as a building, although some part of it may remain standing. *O'Keefe v. Liverpool, London & Globe Ins. Co.,* 140 Mo. 558, 564, 41 S.W. 922, 923 (1897); *Stahlberg v. Travelers Indem. Co.,* 568 S.W.2d 79, 84 (Mo.App.1978). The standard for determining whether a loss is total or partial differs for real and personal property. *See State ex rel. North British & Mercantile Ins. Co. v. Cox,* 307 Mo. 194, 200, 270 S.W. 113, 115 (banc 1925).

S.W. 78, 81 (1918). In cases of partial loss, the burden is on the insured to prove the value of the property both before and after the casualty. *Franklin,* 627 S.W.2d at 113; *Brown,* 263 S.W.2d at 900. *See Bolton v. Missouri-Kansas-Texas Railroad,* 373 S.W.2d 169, 173–74 (Mo.App.1963); *Johnstone,* 34 S.W.2d at 1033–34.

These statutes clearly affect private insurance contracts that result from direct negotiations between the insurance company and the consumer. Whether these statutes affect insurance coverage procured through the Missouri FAIR Plan, however, is an altogether different matter. In order to make that determination it is necessary to examine the history of, and the policies that underlie, the FAIR Plan. Our "primary responsibility," *Goldberg v. Administrative Hearing Commission,* 609 S.W.2d 140, 144 (Mo. banc 1980), is "to determine and give effect to the intent of the legislature," *State v. White,* 622 S.W.2d 939, 944 (Mo. banc 1981), *cert. denied,* 456 U.S. 963, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). In ascertaining legislative intent we are obliged to "consider the purpose or goal of the statute and any relevant conditions existing at the time it was enacted." *Id.*

State FAIR Plans are a by-product of the urban social upheaval of the late 1960's. In that period

> the urban population level reached the saturation point and we began to hear about complex difficulties facing our metropolitan areas. Problems began to multiply; among the most serious concerns were an increasing unemployment rate, inadequate housing, poverty-stricken inhabitants, and, in many instances, discrimination against basic human rights and privileges.... To a large extent, these areas became isolated from the rest of the community.... A decaying city resists capital investment which in turn prohibits urban rehabilitation....

> In the light of these unfavorable developments, property and liability insurers, in the wake of increasing losses, began to curtail urban writings....

> ... [A]s a partial result of insurance unavailability, some business concerns were forced to close, depriving the community not only of the loss of their services, but also, a corresponding and severe loss of job opportunities. Because of a decreasing tax base, city leaders were unable to acquire necessary funds to renew blighted urban areas or to undertake serious efforts to solve the problems. Tensions began to build, slowly at first, but at a steady and dangerous pace.

Jordan, *FAIR Plans—Revisited,* 1970 A.B.A. Sec. Ins., Neg. & Comp.L.Proc. 154, 154–55.

Following the massive urban riots of 1967 and 1968, Congress, at the request of the President, enacted the Urban Property Protection and Reinsurance Act of 1968, Pub.L. No. 90–448, secs. 1101–1106, 82 Stat. 476, 555–67. That Act was designed "to make property insurance more readily available, particularly in urban areas, and to provide reinsurance against riot and civil commotion losses to insurance companies." Bishop, *Federal Riot Reinsurance,* 1969 A.B.A. Sec. Ins., Neg. & Comp.L.Proc. 141, 141. It "was a recognition by the federal government that the problem of inner city ... insurance unavailability was not only a problem for the private insurance sector, but was also an area of major concern for all of the people." Jordan, *supra,* at 155–56. The Act essentially "created a bilateral contract between the United States and the private insurance sector" by which insurance carriers could purchase federal riot reinsurance if they would "develop and participate in urban area insurance pools in a bona fide attempt to solve the deficiencies within the property insurance market." *Id.* at 156. Each insurance company receiving riot reinsurance was required to "cooperate with the State insurance authority in each State in which it [was] to acquire such reinsurance in establishing and carrying out statewide plans to assure fair access to insurance requirements (FAIR plans)." Urban Property Protection and Reinsurance Act of 1968, Pub.L. No. 90–448, sec. 1103, § 1211(a), 82 Stat. 476, 558.

The Missouri FAIR Plan was created in 1969 in direct response to this federal legislation. *See* Act of Aug. 25, 1969, sec. 1, § 379.131(16), 1969 Mo.Laws 521, 527. Under the FAIR Plan all Missouri insurers[7] participate in providing insurance for high-risk property for which insurance would not ordinarily be available. Simply stated, upon application of the owner of such property for insurance, the property is inspected, and within five days thereafter an inspection report is forwarded to respondent. § 379.820. Respondent then reviews the application and the report within five days to determine whether the risk is acceptable. § 379.830. If respondent deems the risk acceptable, the applicant is notified and an insurer is directed to issue a policy insuring the property within three days of receipt of the applicable premium. §§ 379.-825(1), .830(3). The liability assumed by that insurer is then reassigned to the Joint Reinsurance Association, which is composed of all insurers, including the servicing insurer. The Association allocates to each insurer a proportionate share of the risk in the form of mandatory reinsurance for the servicing insurer. §§ 379.825(2), .835. In this manner the risk of insuring high-risk property is equitably spread among all insurers.

The legislature has been careful to articulate the underlying purpose of the Missouri FAIR Plan. The Plan, the legislature has said, was established "to make available *basic property insurance* to persons having property interests in this state who are in good faith entitled to but who are unable to procure such coverage through ordinary methods." § 379.810 (emphasis added). This reflects the avowed congressional purpose to "encourage and assist the various State insurance authorities and the property insurance industry to develop and carry out statewide programs which will make *necessary property insurance coverage* against the fire, crime, and other perils more readily available for residential, business, and other properties." Urban Property Protection and Reinsurance Act of 1968, Pub.L. No. 90–448, sec. 1102(b), 82 Stat. 476, 556 (emphasis added).

When we consider the beneficent purpose of the FAIR Plan and the express language of the statutes creating it, we think it is clear that the legislature intended to establish a mechanism by which owners of high-risk property may obtain insurance coverage only to the extent necessary to protect their interests. The legislature intended to go no further. It defined the "basic property insurance" for which it made provision as

> the coverage against direct loss to real and tangible personal property at a fixed location in an urban area that is *provided in the standard fire policy* and extended coverage endorsement, including builders' risk, and such vandalism and malicious mischief insurance and such other classes of insurance as may be added to the program .... Basic property insurance does not include farm risks, automobile risks, or such other types of manufacturing risks as the governing committee may exclude with the approval of the director[.]

§ 379.815(2) (emphasis added). We can take judicial notice that the standard Missouri fire insurance policy, a copy of which we have obtained from the Division of Insurance, provides coverage only "to the extent of the actual cash value of the property *at the time of loss*." (Emphasis added.) That has been the language of the standard fire insurance policy in Missouri since July 1, 1944, *see* 4 C.S.R. 190–16.060(1)(A) (1978), and it is presumed that the legislature knew of that fact when it enacted the FAIR Plan statutes in 1969, *see Protection Mutual Insurance Co. v. Kansas City*, 504 S.W.2d 127, 130 (Mo.1974). We therefore conclude that the legislature intended the FAIR Plan to impose upon Missouri insurers the burden of insuring high-risk proper-

---

**7.** An "insurer" is defined under the FAIR Plan to be "any insurance company, reciprocal or interinsurance exchange or other organization licensed and authorized by the director [of the Division of Insurance] to write property insurance, including the property insurance components of multiperil policies, on a direct basis, in this state." § 379.815(7).

ty only to the extent of its actual cash value at the time of the loss. Nothing in the history of the FAIR Plan suggests that the legislature intended to require FAIR Plan insurers to provide anything other than no-frills insurance for the benefit of those who could not otherwise obtain coverage.

■ This intent obviously conflicts to a degree with the policies underlying §§ 379.-140–.145, .160, the valued policy statutes. *See Daggs v. Orient Insurance Co.,* 136 Mo. 382, 394–95, 38 S.W. 85, 87 (banc 1896), *aff'd,* 172 U.S. 557, 19 S.Ct. 281, 43 L.Ed. 552 (1899); *Gamel v. Continental Insurance Co.,* 463 S.W.2d 590, 593 (Mo.App.1971). When a conflict appears among statutes it is our duty to reconcile and harmonize them if it is reasonably possible to do so. *Flarsheim v. Twenty Five Thirty Two Broadway Corp.,* 432 S.W.2d 245, 251 (Mo.1968). In view of the clear legislative intent that insurance provided pursuant to the FAIR Plan indemnify property owners only to the extent of the actual cash value of their property at the time of the loss, we are compelled to conclude that the valued policy statutes do not apply to insurance coverage procured through the FAIR Plan. We reach this conclusion for three reasons. First, the valued policy statutes were enacted well before the turn of the century and were a static part of Missouri law at the time the FAIR Plan was established.[8] The legislature presumably was well aware of those statutes and the judicial construction given them. *See Protection Mutual,* 504 S.W.2d at 130; *State ex rel. Missey v. City of Cabool,* 441 S.W.2d 35, 41 (Mo.1969). With this knowledge the legislature designed the FAIR Plan in the manner in which it did. Second, and related to the first, is the fact that because the FAIR Plan statutes were enacted well after the

valued policy statutes were enacted, "the later [statutes prevail] if inconsistencies appear between them." *City of Raytown v. Danforth,* 560 S.W.2d 846, 848 (Mo. banc 1977). Third, the FAIR Plan has a specific application to this particular kind of property insurance, while the valued policy statutes are general in application. "[P]rovisions ... having special application to a particular subject will be deemed a qualification to another statute general in its terms." *Id.*[9]

### III

We turn, then, to whether the trial court erred in sustaining respondent's motion to dismiss for failure to state a claim upon which relief could be granted. In making that determination we must accept as true all facts well pleaded and give appellants the benefit of every favorable inference to be reasonably drawn from the facts pleaded. *Parker v. Sherman,* 456 S.W.2d 577, 578 (Mo.1970). The petition will be considered sufficient if its averments invoke substantive principles of law that entitle appellants to relief. *Estate of Williamson v. Williamson,* 380 S.W.2d 333, 339 (Mo.1964).

### A

Smith alleged in Count II that his property had been totally destroyed by fire, that it was insured for $10,000,[10] and that there had been little or no depreciation of the property between the time the policy was issued and the time of the fire. He claimed that he was entitled under § 379.140 to receive the full amount of the policy but that respondent had improperly deducted depreciation without regard to the date of the policy and had paid him only $8,353.14. The court of appeals found these allegations sufficient on the ground that if in fact

---

**8.** A predecessor of § 379.140 was first enacted in 1879. § 6009, RSMo 1879. Section 379.140 today is virtually identical in language to § 5897, RSMo 1889. Section 379.145 was first enacted in 1889 in form virtually identical to that of the present statute. § 5898, RSMo 1889. A predecessor of § 379.160 was first enacted in 1895, *see* Act of Mar. 18, 1895, 1895 Mo.Laws 194, and the relevant portion of § 379.160 assumed its present form in 1919,

*see* Act of May 30, 1919, § 7030, 1919 Mo.Laws 386, 387.

**9.** We emphasize that we deal here only with insurance coverage procured through the FAIR Plan. Our holding does not affect insurance coverage procured otherwise.

**10.** *See supra* note 4.

there had been no depreciation between the date of the policy and the time of the fire, then "the amount of insurance written on the property is conclusive as to its value" under § 379.140, and respondent would be liable for the entire amount of the policy. This rationale is incorrect in view of our holding that the legislature did not intend the valued policy statutes to apply to insurance coverage procured through the FAIR Plan.

When we consider the remainder of Count II we believe that it fails to state a claim upon which relief can be granted. It alleges only that respondent violated § 379.140 by improperly deducting depreciation without regard to the date of the policy. FAIR Plan policies are actual cash value policies, however, and depreciation may legitimately be considered in order to determine the actual cash value of the insured property at the time of the loss. Smith makes no allegation that depreciation was improperly calculated or that the actual cash value of the property at the time of the loss was greater than the amount respondent paid him pursuant to the policy. Neither does he allege fraud. The trial court did not err in dismissing Count II.

### B

The gravamen of Count I is that appellants Wells, Yung, Maytubby, and Hunter were each entitled to recoup the cost of repair of property partially destroyed by fire. Appellants allege that by deducting depreciation from the cost of repair instead of paying the full cost of repair, respondent violated § 379.150. These allegations, like those in Count II, fail to state a claim upon which relief can be granted.

The language of § 379.150 is specifically made a part of the standard Missouri fire insurance policy used by the FAIR Plan, see 4 C.S.R. 190–16.060(2)(D) (1978), but § 379.-150 is not a valued policy statute and does not compel the result appellants urge. It provides only a method for computing damages in the event of a partial loss of insured property. Section 379.150 provides any insured with two options. He may elect either to take a cash payment or to have the insurer repair the property. Here there is no allegation that appellants elected to have respondents repair their property, so we need not discuss that portion of § 379.-150. Appellants elected to take a cash payment, and respondent paid each of them.[11] The amount to which they were entitled under § 379.150 was a sum "equal to the damage done on the property." That damage is not measured by the cost of repair. E.g., Johnstone, 34 S.W.2d at 1033; Security Printing, 209 Mo.App. at 448, 240 S.W. at 271; Scism, 224 S.W. at 49. As we noted above, our courts have long held that the amount of damages under § 379.150 is to be determined by the difference in value of the property immediately before and immediately after the loss. The value of the property at the point immediately before the loss is, of course, equivalent to the actual value of the property at the time of the loss. Cost of repair is admissible as evidence of damage, but of itself it is insufficient to establish the amount of damage. Berry v. Federal Kemper Insurance Co., 621 S.W.2d 948, 953 (Mo.App.1981). Appellants cite cases from a number of jurisdictions that they contend hold that depreciation should not be deducted from the cost of repair. We need not reach this question, for appellants have made no allegation that

11. The petition alleges that appellants Wells, Yung, Maytubby, and Hunter each received payments from respondent for their claims, but it does not disclose the amounts of the payments. In ruling on respondent's motion to dismiss, the trial court indicated its intent to consider the motion as a motion for summary judgment and allowed the parties to file affidavits and other supporting documents. The trial court ultimately found it unnecessary to pass on the motion for summary judgment, and so do we. From the documents filed, however, we are able to discern that Wells received $9,393.10; Yung received $10,762.90 on the one piece of her property in question; the Maytubbys received $14,316.23; and Hunter received $8,570.32. We are also able to determine that Wells and the Maytubbys signed releases for the amounts they received, and Wells, Yung, Hunter, and the Maytubbys all signed sworn proof of loss statements for the sums they were paid. There are no allegations of fraud.

they received less than the amount to which they would be entitled under the difference in value calculation. The allegations of Count I are premised solely upon the theory that the amount of damages under § 379.-150 equals the cost of repair, and thus Count I fails to state a claim upon which relief can be granted.

Appellants argue, however, that the cost of repair is equivalent to the difference in value of the property immediately before and immediately after the loss. In support of that proposition they cite, from other jurisdictions, *Iowa National Mutual Insurance Co. v. City of Osawatomie,* 458 F.2d 1124 (10th Cir.1972); *Springfield Fire & Marine Insurance Co. v. Ramey,* 245 Ky. 367, 53 S.W.2d 560 (1932); and *Hewins v. London Assurance Corp.,* 184 Mass. 177, 68 N.E. 62 (1903). *City of Osawatomie* is inapposite, but *Ramey* indeed equates cost of repair with the difference in value, 245 Ky. at 373, 53 S.W.2d at 563, and *Hewins* appears to do so. We cannot, however, accept the argument that the two measures are equal. *Hewins* well illustrates the fallacy in this proposition. In *Hewins* a building was damaged by fire, and the issue was whether the building laws were to be considered in computing the damages. The cost of repairing the building would have been $30,610 if the building laws were not considered but $45,792 if they were considered. 184 Mass. at 181, 68 N.E. at 63. The court did not indicate the value of the building immediately before the fire, but the fair inference from the court's discussion is that because of the requirements of the building laws the building would be worth more after repair than it had been worth before the fire. In such a case the cost of repair obviously would not be equivalent to the difference in value of the property before and after the loss.

The judgment is affirmed.

RENDLEN, C.J., HIGGINS, GUNN and DONNELLY, JJ., MAUS, Special Judge, and SEILER, Senior Judge, concur.

BILLINGS, J., not sitting.

BLACKMAR, J., not participating because not a member of the Court when cause was submitted.