Leona A. VILLINES, Appellant,

v.

DIVISION OF AGING AND MISSOURI
DEPARTMENT OF SOCIAL
SERVICES, Respondents.

No. 67994.

Supreme Court of Missouri,
En Banc.

Jan. 13, 1987.

Rehearing Denied Feb. 17, 1987.

Thomas E. Hankins, Gladstone, for appellant.

Gregory W. Schroeder, Diane E. Felix, Jefferson City, for respondents.

WELLIVER, Judge.

Appellant, Leona Villines, seeks reversal of a decision of the Missouri Administrative Hearing Commission which affirmed the decision of the Missouri Department of Social Services, Division of Aging revoking appellant's nursing home license pursuant to § 198.036, RSMo Cum.Supp.1983. The Missouri Court of Appeals, Western District affirmed the revocation. Considering the importance of the issues raised herein, we ordered transfer of this case in order to clarify the law regarding the power of the Department of Social Services to revoke the license of a nursing home operator under the Omnibus Nursing Home Act.

§§ 198.003–.186, RSMo Cum.Supp.1983.[1] We reverse the decision of the Administrative Hearing Commission.

## I

Appellant, owner, operator and administrator of Carle Manor Nursing Home, began operation of the facility under a temporary license from the Department of Social Services (Department) on December 4, 1982. At the time appellant purchased the home, conditions were such that the Department had begun proceedings to close the facility. While the reports of the Department's inspection and its reinspection of the facility were not formally introduced into evidence, the record presented indicates that of the approximately 115 violations existing at Carle Manor before appellant acquired the home only four remained uncorrected on the date of the fifty-five day reinspection. As a result of appellant's degree of compliance with the statutory requirements of the Act, the Department issued her a permanent license to operate the home as an intermediate care facility on July 5, 1983.

In a letter dated August 19, 1983, the Division of Aging (Division) of the Department of Social Services informed appellant that as a result of inspections conducted on July 29 and August 1, 1983, the Division had decided to revoke her license to operate the intermediate care facility in accordance with §§ 198.036.1(1) and 198.036.1(3), RSMo Supp.1982.

The July 26, 1983 incident which prompted the investigation involved an eighty-four-year-old resident of Carle Manor. At approximately 8:30 a.m. on the day of the incident, the resident, a victim of senile dementia, suffered from diahrrea and as a result had a bowel movement, soiled herself, and required cleaning. Nurse's Aide Crutchfield gave the resident a bath, dressed her in clean clothing, and placed her in bed for a nap. Although the physi-cian's notes indicated that the resident should be restrained, the aide left her unrestrained and unattended because the resident usually took a nap after a bath. There was some evidence that the resident had trouble sleeping while restrained and that a family member had objected to use of the restraints.

Later that morning, another nursing home aide found the resident naked in the hall near the bathroom soiled from another bowel movement. When Aide Crutchfield took the resident into the bathroom to clean her, she discovered feces in a tub of hot water. Although no one witnessed the incident, the aide's discovery indicates that the resident wandered into the bathroom, turned on the hot water faucet and sat down in the tub of hot water to try to bathe herself.

As the aide began cleaning the resident, she noticed marks upon the resident's buttocks and arm prompting her to call the nurse on duty. Licensed Practical Nurse Mary Etta Morris examined the injury and, following appellant's policy and state regulations for accident treatment, 13 CSR 15–14.042(73) (1984), called the home's physician, Dr. McKinley. Nurse Morris and Dr. McKinley somewhat differed in their accounts of this conversation. Dr. McKinley did testify that from Nurse Morris' description of the incident in the telephone conversation, she concluded that the resident's injury was not serious and told Nurse Morris she would come to the nursing home in the next day or so and if problems arose, to take the resident to an emergency room.

Nurse Morris testified that she applied carbolated vaseline and sterile Pampers to the injury and checked on the resident periodically during the remainder of the day shift. Nurse's Aide Allen succeeded Nurse Morris on duty at 3 p.m. and cared for the resident throughout the evening. Nurse

---

1. Although the Missouri legislature amended portions of the Act since the Administrative Hearing Commission rendered its decision in this case, see §§ 198.003–.186, RSMo Supp.1984, we review this case under the law in effect on the date of the Commissioner's decision. No changes in the Act made subsequent to that date bear on the analysis or decision in this case unless otherwise indicated.

Morris returned later that night to change the resident's dressing.

Appellant, a licensed practical nurse, was at the home when the incident occurred. She looked in on the resident throughout the day, and after leaving Carle Manor, telephoned several times to inquire about the resident's condition. In the telephone conversations, Nurse's Aide Allen told appellant that after sitting in a chair and eating a full meal, the resident was resting without complaint of discomfort.

At approximately 12:30 a.m. on July 27, 1983, a nursing home employee telephoned appellant to report that he thought the resident's injury looked bad. Appellant returned to the home and took the resident to Truman Medical Center where the emergency room staff diagnosed the injury as second degree burns to the buttocks, lower back and left shoulder, and one and one-half to second degree burns to the dorsal forearm. The Medical Center staff debrided the area, trimmed the blisters, applied Silvadene cream and sterile dressing, and released the resident. Appellant returned the resident to Carle Manor and remained with her until Nurse Morris arrived for the day shift.

On July 28, 1983, two days after the incident, Dr. McKinley examined the resident at Carle Manor and made a written order instructing the nursing home staff to contact her if the resident's temperature rose above 100 degrees or to admit the resident to a hospital if the burns appeared pustular. That evening the resident's temperature reached 101 degrees and the nursing home staff took her to Trinity Lutheran Hospital where Dr. McKinley admitted her for treatment.

In response to a complaint which, as far as we know was of unknown origin, the Division conducted an investigation at Carle Manor. Investigator Charlotte Jen-

nings testified that she interviewed nursing home personnel present on the day of the incident and reviewed the resident's nursing home records. Three days after the incident, she went to Trinity Luthern Hospital to examine the resident's injuries and to speak with the resident.

During the investigation an environmental sanitarian from the Division checked the water from the plumbing fixtures accessible to residents. He found the water temperature to be 148 degrees Fahrenheit on August 1, 1983, 142 degrees Fahrenheit on August 16, 1983, and 134 degrees Fahrenheit on August 30, 1983. Regulations require that the water temperature be no more than 120 degrees Fahrenheit. 13 CSR 15–14.031(3)(L)5 (rescinded October 13, 1983 and reenacted as 13 CSR 15–14.-032(22) (1984)). The record indicates that the nursing home maintenance man attempted to lower the water temperature after each measurement and that the excessive temperature was finally effectively reduced after appellant padlocked the door to the hot water heater. The sanitarian testified that the temperature reading on August 31, 1983 was 117 degrees Fahrenheit, three degrees below the regulatory requirement. At the administrative hearing, the parties stipulated that on September 30, 1983, the water temperature complied with the 120 degree Fahrenheit requirement of 13 CSR 15–14.031(3)(L)5 (rescinded October 13, 1983 and reenacted as 13 CSR 15–14.032(22) (1984)).

As a result of the investigation, the Division revoked appellant's license for violation of the following regulations:

1. A physician was not immediately contacted when the resident was injured, nor was emergency treatment given, in violation of 13 CSR 15–14.070(G) and (H). (Class I violation);[2]

---

**2.** The Omnibus Nursing Home Act authorizes the Department to promulgate standards for intermediate care facilities and requires the Department to classify the standards according to the degree of harm a resident may suffer as a result of violation of the standard. *See* §§ 198.-079 and 198.085, RSMo Cum.Supp.1983. Class I

standards are standards the violation of which would present either an imminent danger to the health, safety or welfare of any resident or a substantial probability that death or serious physical harm would result. § 198.085(1), RSMo Cum.Supp.1983. Class II standards are standards which have a direct or immediate

2. Residents did not receive the type of considerate care required by their conditions, in violation of 13 CSR 15–14.070(2)(A). (Class I violation);

3. The operator and her employees knowingly performed or failed to perform acts which adversely affected the health, safety and welfare of a resident, in violation of 13 CSR 15–14.060(4)(C). (Class I violation);

4. Hot water which was accessible from plumbing fixtures, to residents in the facility, had a maximum temperature of 148 degrees Fahrenheit, in violation of 13 CSR 15–14.031(3)(L)5. (Class I violation).[3]

In accordance with § 198.039, RSMo Cum.Supp.1983, appellant filed a petition for a hearing before the Administrative Hearing Commission seeking a determination of the Division's action. On September 1, 1983, the Commission granted appellant's motion to stay the order of revocation allowing the home to remain open pending the Commission's determination of the case. See § 198.039.2, RSMo Cum. Supp.1983.

There is no question that all parties admitted the facts sustaining charge number four and that respondent produced sufficient evidence to sustain charges one, two, and three technically.

Appellant's evidence at the hearing included testimony of the Deputy Public Administrator of Jackson County who testified that he was pleased with the treatment appellant provided and that he had received no complaints from the wards or their rela-

tives concerning the quality of care at Carle Manor. Relatives of several of the nursing home residents testified that appellant and her staff kept the home and the residents clean, furnished nutritious meals, provided proper nursing treatment, and treated the residents with care. Also, two nurse's aides who had worked for the previous owner of the nursing home testified that upon acquiring the home, appellant made significant improvements in the facility and in patient care.

On January 27, 1984, the Commission upheld respondents' decision to revoke appellant's license and on respondents' motion, dissolved the stay order. Appellant filed an appeal and a motion to stay the revocation in the Missouri Court of Appeals, Western District. On February 3, 1984, the appellate court granted appellant's motion staying enforcement of the revocation decision. On January 28, 1986, the appellate court, with two judges dissenting, affirmed the Commission's decision. The home still remains open pending our decision in this case.

## II

Appellant contends that the incident upon which respondents made their decision to revoke her nursing home license does not provide a sufficient legal basis for revocation because the Missouri legislature did not intend to allow respondents to take such drastic measures on the basis of a single non-life-threatening incident. She maintains that the legislature intended to

---

relationship to the health, safety or welfare of any resident, but which do not create imminent danger. § 198.085(2), RSMo Cum.Supp.1983. Class III standards are standards which have an indirect or a potential impact on the health, safety or welfare of any resident. § 198.085(3), RSMo Cum.Supp.1983.

The Department may assign a dual classification to each regulation, such as I/II. 13 CSR 15–10.020(2) (1983). The lower classification will be applied "unless the division can show that the higher classification is merited because of the extent of the violation, the violation's effect on residents, or the impact when combined with other deficiencies." 13 CSR 15–10.-020(2)(1983). The notice of revocation which

the Division sent to appellant specified that they had applied the higher classification to appellant's violations 1, 2 and 4.

3. Although the Division originally charged that a licensed nurse had not been on duty during all day shifts, as required by 13 CSR 15–14.-060(3)(G)(7) (rescinded October 13, 1983 and reenacted as 13 CSR 15–14.042(30)(C) (1984)), the parties stipulated that the records of Carle Manor Nursing Home showed that a licensed practical nurse was on duty in the facility during the day shift in August and September 1983, as required by 13 CSR 15–14.060(3)(G)7. As a result, the Commissioner did not base his decision on the violation of this regulation.

develop a working relationship between operators and the Department in order to give operators an opportunity to correct deficiencies before the Department takes steps to close a facility. Respondents, however, argue that the Omnibus Nursing Home Act does not establish any conditions precedent to the institution of license revocation procedures when an operator violates a personal, as opposed to an institutional, standard of care. They maintain that the incidents which occurred at Carle Manor on July 26, 1983 and appellant's failure to promptly comply with the water temperature regulations justifies their decision to revoke appellant's nursing home license under § 198.036, RSMo Cum.Supp. 1983.

The answer to this dispute rests upon our interpretation of the provisions of the Omnibus Nursing Home Act and the legislative intent we derive therefrom. We are cognizant of our limited scope of review of the final decision of the Administrative Hearing Commission in a nursing home license revocation proceeding. According to § 198.039, RSMo Cum.Supp.1983, we must review these decisions under § 161.-338, RSMo 1978 which provides:

> In cases reviewable under the provisions of section 162.337, the decision of the administrative hearing commission shall be upheld *when authorized by law* and supported by competent and substantial evidence upon the whole record, if a mandatory procedural safeguard is not violated *and if the approval or disapproval of the exercise of authority in question by the administrative hearing commission does not create a result or results clearly contrary to that which the court concludes were the reasonable expectations of the general assembly at the time such authority was delegated to the agency.*

Section 161.338, RSMo 1978 (emphasis added).[4]

■ Our primary responsibility is to determine and give effect to the intent of the legislature. *Goldberg v. Administrative Hearing Comm'n,* 609 S.W.2d 140 (Mo. banc 1980). *See also, Collins v. Director of Revenue,* 691 S.W.2d 246 (Mo. banc 1985); *Wells v. Missouri Property Ins. Placement Facility,* 653 S.W.2d 207 (Mo. banc 1983); *State v. White,* 622 S.W.2d 939 (Mo. banc 1981), *cert. denied,* 456 U.S. 963, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). Historically, this Court has given liberal construction to the provisions of the nursing home law in order to effectuate legislative intent while striving to maintain high quality care for the elderly. *See State ex rel. Eagleton v. Patrick,* 370 S.W.2d 254 (Mo. 1963). In *Stiffelman v. Abrams,* 655 S.W.2d 522 (Mo. banc 1983), upholding the private remedy provision of the Omnibus Nursing Home Act, § 198.093, RSMo Supp. 1980, we said with respect to the 1979 Omnibus Nursing Home Act that:

> The Act before us, consisting of sixty-three sections and repealing and replacing the former 1957 licensure law, is a comprehensive regulation of the nursing homes of this state. In rejecting the contention that the Act's predecessor, the 1957 statute, should be strictly construed, this court made the following observations which bear repeating here: 'The obvious purpose of this statute is to protect the health and safety of citizens who are unable fully to take care of themselves, particularly the more elderly persons, who, from necessity or choice, spend their later years in homes of the type which the statute would license or regulate.... Such an enactment as this is a vital and most important exercise of the state's police power.... As such its construction, consistent with its terms, should be sufficiently liberal to permit accomplishment of the legislative objection ...' *State ex rel. Eagleton v. Patrick,* 370 S.W.2d 254, 257 (Mo.1963).

*Stiffelman,* 655 S.W.2d at 528.

It is with this background that we examine the Omnibus Nursing Home Act to seek the answer to this dispute.

---

4. Sections 161.337 and 161.338, RSMo 1978 were transferred without change to §§ 621.189 and 621.193, RSMo Supp.1984.

## II

### A

In reaction to a nursing home fire which killed twenty-five boarding home residents, the Missouri legislature enacted the 1979 Omnibus Nursing Home Act, §§ 198.003–.186, RSMo Supp.1980. *See* Vossmeyer and Felix, *The Missouri Omnibus Nursing Home Act of 1979: A Legislative History*, 24 St. Louis U.L.J. 617, 619 (1980–81). The Omnibus Nursing Home Act, "an exercise of the police power of the state, directed to the protection of the health, safety, and welfare of a large and increasing nursing home population. . . ." *Stiffelman* 655 S.W.2d at 528, addresses the need to insure adequate patient care through a variety of statutory devices.

One of the lawmakers' major concerns was the State's inability to end inadequate patient care through license revocation or nonrenewal. *See* Vossmeyer and Felix, *supra*, at 636. To remedy this deficiency, the General Assembly enacted provisions requiring nursing home operators to meet certain minimum requirements to remain operational. *See* §§ 198.079 and 198.085, RSMo Cum.Supp.1983 and 13 CSR 15–10.-020 (1983). They did not, however, leave the operators alone in their attempt to meet these requirements, but developed a scheme through which the working together with the Department could fulfill their statutory obligations to the elderly. *See* §§ 198.015, 198.022 and 198.026, RSMo Cum.Supp.1983. The Department issues each nursing home an annual license. §§ 198.015.2 and 198.015.6, RSMo Cum. Supp.1983. Upon receipt of the application for a license, the Department reviews the application, investigates the applicant, and conducts investigations to insure that the operator is in substantial compliance with health and safety regulations. §§ 198.015 and 198.022, RSMo Cum.Supp.1983. After the operator receives a license, the Department must conduct at least two inspections per year, although they may inspect the facility and records at other times as necessary. § 198.022.3, RSMo Cum.Supp.1983.

Whenever an inspection reveals that the level of nursing home care is not commensurate with statutory requirements, the Department takes steps to help the operator correct any deficiencies. § 198.026, RSMo Cum.Supp.1983. During an exit interview, the Department must inform the operator of the problems uncovered in the inspection and, within ten working days after the inspection, must supply the operator with a written report of any deficiency and a correction order. §§ 198.036.1 and 198.029, RSMo Cum.Supp.1983. The operator or administrator has ten working days following receipt of the report and order to submit a plan of correction for the Department's approval. § 198.026.2, RSMo Cum. Supp.1983. The Department must conduct an inspection within fifty-five days of the original inspection to determine if any deficiencies remain uncorrected. § 198.026.3, RSMo Cum.Supp.1983. If the facility does not comply substantially with the standards for patient care, dietary, fire safety, or sanitation, and the operator is not correcting the violations in accordance with the time schedule of the approved plan, the Department issues a notice of noncompliance informing the operator or administrator that the Department may seek the imposition of sanctions. §§ 198.026.3 and 198.026.4, RSMo Cum.Supp.1983.

The Act provides an alternative procedure for correction of statutory infractions. At any time after an inspection, the operator may enter a consent agreement with the Department to obtain a probationary license. The operator agrees to surrender voluntarily the license if he fails to achieve substantial compliance with the regulations in accordance with the terms of the plan. § 198.026.5, RSMo Cum.Supp.1983.

■ Nothing in the Act indicates that either of these statutory alternatives for Departmental aid to deficient homes restricts this assistance to problems regarding violations of institutional, as opposed to patient care, regulations. On the contrary, the legislation specifically includes patient care in the statutory scheme of inspection,

correction and reinspection. *See* §§ 198.-022 and 198.026, RSMo Cum.Supp.1983.

To insure compliance with the rules, the legislature authorized the Department to impose sanctions for violations of the Act and the rules promulgated thereunder. The legislators developed a variety of sanctions, the most severe of which is revocation of the operator's license. The Act provides that the Department may revoke a license in any case in which it finds that the operator:

(1) Failed or refused to comply with class I or II standards, as established by the department pursuant to section 198.-085; or failed or refused to comply with class III standards as established by the department pursuant to section 198.085, where the aggregate effect of such non-compliances presents either an imminent danger to the health, safety or welfare of any resident or a substantial probability that death or serious physical harm would result;

(2) Refused to allow representatives of the department to inspect the facility for compliance with standards;

(3) Knowingly acted or knowingly omitted any duty in a manner which would materially and adversely affect the health, safety, welfare or property of a resident; or

(4) Demonstrated financial incapacity to operate and conduct the facility in accordance with the provisions of section 198.003 to 198.096.

Sections 198.036.1(1), (2), (3) and (4), RSMo Cum.Supp.1983.

Recognizing the difficulty associated with closing nursing homes and relocating residents, the legislators included other less drastic remedies to allow facilities to remain open while corrections are made. *See* Vossmeyer and Felix, *supra,* at 636. Section 198.067.1, RSMo Cum.Supp.1983 provides injunctive relief to enjoin a violation of the Act, to enjoin the acceptance of new residents until the operator substantially complies with the regulations, or to enjoin any specific action or practice of the facility. To encourage prompt correction of deficiencies § 198.067.2, RSMo Cum. Supp.1983 provides that the Department may impose civil fines upon an operator who fails to comply with the standards after receiving a notice of noncompliance. In addition, the legislature outlined a receivership program allowing homes to remain open under the guidance of competent management while corrections are completed. *See* §§ 198.099–.136, RSMo Cum. Supp.1983. Furthermore, the Act allows residents deprived of the rights bestowed by the Act to bring private civil actions against the owner or operator for redress of grievances. *See* § 198.093, RSMo Cum. Supp.1983; *see also Stiffelman,* 655 S.W.2d 522. A review of these sanctions, seemingly promulgated to fit the severity of the violation involved, reinforces the position we took in *Stiffelman* that "[t]he legislature no doubt saw the availability of remedies less drastic than the shutdown of a deficient home as being in the best interest of nursing home residents for many of whom forced transfers occasioned by revocation would be dispiriting and even life-threatening." *Stiffelman,* 655 S.W.2d at 530.

To understand fully the legislative intent of the Omnibus Nursing Home Act, we must consider not only its language, but also the problems of the aged which the lawmakers sought to alleviate through its enactment. *See State v. Kraus,* 530 S.W.2d 684 (Mo. banc 1975); *State ex rel. Gerber v. Mayfield,* 365 Mo. 255, 281 S.W.2d 295 (banc 1955). It is well documented that many nursing home residents suffer from debilitating conditions such as failing health, mental disease, and susceptibility to shock. *See* Staff of Subcomm. on Long-Term Care of the Senate Special Comm. on Aging, 94th Congress, 2d Session, Nursing Home Care in the United States: Failure in Public Policy (Supporting Paper No. 7 1976), as quoted in *Friedman v. Division of Health,* 537 S.W.2d 547, 548–49 (Mo. banc 1976). Those seeking residences in homes designed to meet these special needs find that the availability of beds in well-run facilities continues to decrease as the demand for nursing home

care continues to increase.[5] *See* Note, *Medicaid Recipients' Access to Nursing Homes: Reflections on the New Jersey Approach,* 24 St. Louis U.L.J. 806 (1981). Once settled in a home, the trauma resulting from forced transfer often causes mental and physical set backs. *See* Gershuny and Hirsh, *Transfer and Discharge of Nursing Home Residents: Consequences and Rights,* Med. Trial Tech.Q. 477 (1980); Butler, *Assuring the Quality of Care and Life in Nursing Homes: The Dilemma of Enforcement,* 57 N.C.L.Rev. 1317, 1350–51 (1979). The severity of the complications from "transfer trauma" ranges from mild depression to severe illness and death. *See* Gurshuny and Hirsh, *supra,* at 478. We have recognized this problem in *Friedman,* 575 S.W.2d 547 and *Stiffelman,* 655 S.W.2d 522, as has the United States Supreme Court in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 784 n. 16, 100 S.Ct. 2467, 2475 n. 16, 65 L.Ed.2d 506 (1980).

## II

### B

■ Considering the statutory scheme of the Omnibus Nursing Home Act and the legislative policies behind its implementation, it is obvious that the General Assembly intended to create an ongoing relationship between the nursing home operators and the Department to allow them to work together in correcting deficiencies in order to provide the highest quality of nursing home care to the aged and infirmed. It is significant that the legislature provided a variety of sanctions and remedies most of which allow homes to remain open while corrections are made. This indicates a belief on the part of the legislature that the Department should not impose a more severe sanction than necessary to remedy the violation involved. It is obvious that the legislature believed that revocation should not be imposed unless necessary. As we noted in *Friedman:*

A large portion of the incentive to bring a particular nursing home to standard by inspections, noting defects and requiring improvements, followed by re-inspections to see if the improvements were accomplished, with further inspections and continued insistence on improvement, would disappear. It is a serious step to revoke a license, as the patients are the ones likely to suffer the most—they would have to go elsewhere—and we believe the legislature intended the division should have the chance to work with an operator over a period of several years if necessary before concluding there is no alternative other than revocation of the license.

*Friedman,* 537 S.W.2d at 556. Although the legislature limited the time that the *Friedman* Court was willing to allow for the inspection, correction, and reinspection process, the maintenance of an ongoing relationship between the nursing home and the Department to allow well-run facilities to remain operational remains a primary goal. Read as a whole, every section of the Act, except the revocation section, contemplates the Department and operators working together for the benefit of all of the elderly.

## II

### C

■ Having examined the legislative intent of the Omnibus Nursing Home Act, we believe that the legislature did not intend to give respondents the authority to revoke appellant's license on the facts presented in this case. The Division based its decision on a single incident which was not in itself life-threatening. Nothing in the record indicates that appellant's acts were abusive, reckless, or intentionally or grossly negligent. On the contrary, the record shows that immediately following the accident, appellant and the staff took steps to remedy the situation. They admin-

---

5. There are 84.9 beds for every 1,000 Missouri residents 65 years of age and older. State Center for Vital Statistics, Missouri Dep't of Health, Missouri Nursing Home and Residential Care Facility Profiles 8 (1984).

istered first aid, closely monitored the resident's progress, and took the resident to a hospital emergency room for treatment. Although Nurse Morris contacted the house doctor, for reasons not entirely clear from the record, the doctor chose not to examine the patient until two days after the incident. The only alleged violation cited in the notice of revocation which continued past the date of the accident was appellant's failure to lower the water temperature. It is important to note that each time the Division inspector found the water temperature above the regulatory maximum, it was lowered, and within thirty days of the first measurement, the temperature was regulated to below 120 degrees Fahrenheit. There is no evidence that any other residents were harmed by the rise in the water temperature. With the exception of the reinspection of the level of the water temperature, there is no indication that respondents gave appellant an opportunity to correct any other alleged deficiencies.

Most of the testimony, other than that relating to the July 26, 1983 incident, concerned appellant's ability to manage the intermediate care facility. According to relatives of residents of Carle Manor and the nursing home staff, appellant provides a clean environment and warm surroundings for those entrusted to her care. As the record indicates, appellant had made significant improvements in the condition of the facility and the quality of patient care in a very short period of time.

Evidently respondents substantially agreed with those testifying to appellant's ability to run an the facility, for less than one month before the incident respondents issued appellant a permanent nursing home license. Moreover, the Administrative Hearing Commission and the Western District issued orders allowing Carle Manor to remain open pending decisions in this case.

Closing the home at this time based on a single incident of non-life-threatening nature which occurred several years ago without evidence of violations since that time could upset the lives of all of the residents of Carle Manor. Some thirty-four residents would undergo the traumatic experience of moving to other facilities, if such are currently available.

On the facts of this case, we believe that the legislature intended something more than a single incident which is not in itself life-threatening, and which, if corrected within a reasonable amount of time, presents no "imminent danger to the health, safety, or welfare of any resident" as grounds for license revocation. We do not hold that a single incident or a series of incidents relating to one resident may never provide sufficient legal grounds for revocation, but we find it unnecessary to hypothesize situations which may necessitate that decision. On our interpretation of the law, we believe the action of the Administrative Hearing Commission creates a result "clearly contrary ... to the reasonable expectations of the general assembly." § 161.338, RSMo 1978.

Respondents allege several irregularities in appellant's brief and move to dismiss the appeal for procedural violations. In view of the importance of the issues raised in this case affecting care of the elderly, we decline to dismiss the appeal for mere technical violations of the rules of appellate procedure. We reverse the decision of the Administrative Hearing Commission.

All concur.