

# In the Missouri Court of Appeals
## Western District

| | |
|---|---|
| WHISPERING OAKS RCF MANAGEMENT COMPANY, INC., | ) ) |
| Appellant, | ) |
| v. | )      WD76476 |
| | ) |
| MISSOURI DEPARTMENT OF HEALTH and SENIOR SERVICES, | )      FILED: August 5, 2014 ) |
| Respondent. | ) |

## APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
### THE HONORABLE JON E. BEETEM, JUDGE

### BEFORE DIVISION ONE: MARK D. PFEIFFER, PRESIDING JUDGE,
### LISA WHITE HARDWICK AND KAREN KING MITCHELL, JUDGES

Whispering Oaks RCF Management Co. Inc. ("Appellant") brings ten points on appeal challenging the Administrative Hearing Commission's (the "AHC") decision to deny Appellant a license to operate as a long term care facility. This appeal arises from the circuit court's judgment affirming the AHC's decision. For reasons explained herein, we find no error in the AHC's licensure denial and therefore affirm the circuit court's judgment.

### THE OMNIBUS NURSING HOME ACT

This appeal involves the denial of a license to operate as a long term care facility under the 1979 Omnibus Nursing Home Act (the "Act"), Sections 198.003 to 198.186.[1] Before delving into the facts of the current appeal, it is helpful to review the statutory framework of the Act.

"The Omnibus Nursing Home Act, 'an exercise of the police power of the state, directed to the protection of health, safety, and welfare of a large and increasing nursing home population . . . ,' addresses the need to insure adequate patient care through a variety of statutory devices." *Villines v. Div. of Aging and Mo. Dept. of Soc. Servs.*, 722 S.W.2d 939, 944 (Mo. banc 1987) (alteration in original) (citation omitted) (quoting *Stiffelman v. Abrams*, 655 S.W.2d 522, 528 (Mo. banc 1983)).

Under the Act, the Department of Health and Senior Services ("DHSS") is authorized to issue licenses to operate nursing homes in the State of Missouri. In order to qualify for a license, nursing home operators must be in "substantial compliance" with standards under the Act relating to the health and safety of the facility's residents. *See* § 198.022.1(2). These operational standards are classified according to the seriousness of their effect on the welfare of the facility's residents.

> (1) Class I standards are standards the violation of which would present either an imminent danger to the health, safety or welfare of any resident or a substantial probability that death or serious physical harm would result;
>
> (2) Class II standards are standards which have a direct or immediate relationship to the health, safety or welfare of any resident, but which do not create imminent danger;
>
> (3) Class III standards are standards which have an indirect or a potential impact on the health, safety or welfare of any resident.

---

[1] All statutory references are to the Revised Statutes of Missouri 2000, as updated by the Cumulative Supplement 2013, unless otherwise indicated.

§ 198.085.

"Upon receipt of an application for a license to operate a facility, the [DHSS] shall review the application, investigate the applicant . . . and conduct any necessary inspections" to ensure that the operator is in "substantial compliance" with the statutory requirements and accompanying regulations. § 198.022.1.  Whenever an inspection reveals that a facility is not in compliance with the Act's health and safety standards, the DHSS must provide the facility's operator with a statement of deficiencies ("SoD") within ten working days after the inspection. § 198.026.1.  The facility's operator must then submit a plan of correction to the DHSS that contains specific dates for achieving compliance, which are subject to the DHSS's approval. § 198.026.2.  Sometime thereafter, the DHSS must conduct a reinspection to determine whether any of the "previously cited deficiencies" remain uncorrected. § 198.026.2.

With these licensure procedures in mind, we move to consider the facts of the case before us.


## FACTUAL & PROCEDURAL HISTORY

Appellant, Whispering Oaks RCF Management Co. Inc., is a Missouri corporation.  Whispering Oaks Residential Care Facility, LLC ("Whispering Oaks RFC") is a Missouri limited liability company.  At all relevant times, both Appellant and Whispering Oaks RFC were owned by Naren Chaganti.  On August 29, 2008, Whispering Oaks RFC purchased a 70-bed residential care facility (the "Facility").

Prior to Appellant's acquisition of the Facility, the Facility was operating as a long term care facility under the Act.  Pursuant to Section 198.015.4 of the Act, Appellant

3

was required to obtain its own — or a new — operating license upon assuming control of the Facility.  On October 3, 2008, the DHSS issued Appellant a temporary permit to operate the Facility as a long term care facility,[2] and on October 6, 2008, Appellant applied to the DHSS for a license to operate the Facility as a long term care facility.

On January 29 and 30, 2009, the DHSS inspected the Facility as part of its processing of Appellant's licensure application.  On February 3, 2009, as a result of the January inspection, the DHSS issued Appellant a SoD (the "February 2009 SoD"), citing numerous class II and III violations of the regulations promulgated under the Act.

In April 2009, the DHSS conducted a reinspection of the Facility to determine whether the February 2009 deficiencies had been corrected.  On April 29, 2009, as a result of the reinspection, the DHSS issued Appellant a SoD (the "April 2009 SoD"), which included five class II violations that remained uncorrected from the February 2009 SoD.

On May 15, 2009, the DHSS sent a letter notifying Appellant that its application for a license to operate the Facility as a long term care facility was denied.  The DHSS stated that the denial was based on "the uncorrected Class II violations" identified in the April 2009 SoD.  The DHSS letter also stated that Appellant's temporary permit to operate the Facility as a long term care facility would become null and void on June 30, 2009.  By January 14, 2010, the Facility was closed and all of its residents had been relocated.

---

[2] "The department shall grant an operator a temporary operating permit of sufficient duration to allow the department to evaluate any application for a license submitted as a result of any change of operator."  § 198.015.9.

On May 29, 2009, Appellant filed a complaint against the DHSS with the AHC. In the complaint, Appellant asserted that it was "fully qualified to operate a [long term care facility] at [the Facility] and therefore the [DHSS's] denial of Application for License should be set aside."

In August and October 2010, a hearing was held before the AHC. On December 7, 2012, after the hearing and post-hearing briefing, the AHC issued its decision denying Appellant's application for licensure. The AHC found that Appellant "failed to demonstrate that it is qualified to be licensed by showing substantial compliance with regulations and that any cited deficiencies have been timely corrected." Appellant then appealed to the Circuit Court of Cole County, which affirmed the AHC's decision. This appeal follows.

## STANDARD OF REVIEW

Section 536.140 defines the scope of appellate review. On appeal of this administrative decision, our review is of the AHC's findings and conclusions, not the circuit court's judgment. *Hernandez v. State Bd. of Registration for the Healing Arts,* 936 S.W.2d 894, 900 (Mo. App. 1997). We will affirm the AHC's decision unless it is unsupported by competent and substantial evidence upon the whole record or is unauthorized by law. § 536.140.2. "The Commission's decision is presumed valid, and the burden is on the attacking party to overcome that presumption." *Hernandez,* 936 S.W.2d at 900. The record must be viewed in a light most favorable to the AHC's decision, according great deference to its findings of fact. *Dorman v. State Bd. of Registration for the Healing Arts,* 62 S.W.3d 446, 454 (Mo. App. 2001). Questions of

5

law, however, are reserved for the independent judgment of the reviewing court.  *State Bd. of Registration for the Healing Arts v. Boston,* 72 S.W.3d 260, 263 (Mo. App. 2002).

**ANALYSIS**

***Point I — Whether the DHSS properly delegated its authority to deny Appellant licensure***

In Point I, Appellant contends the AHC erred in denying Appellant a license to operate because such denial was "a product of an unconstitutional delegation of power."  Under the Code of State Regulations, the DHSS  "shall not" issue "a notice of noncompliance for uncorrected violations of class II or III standards, unless the facility's record, the cited violations and the circumstances are reviewed by the director of [the DHSS] or his/her designee."  MO. CODE REGS. ANN. tit. 19, § 30-82.020(6) (Title 19 of the Code of State Regulations shall be short cited hereinafter as "19 CSR.").  Appellant asserts that the Notice of Noncompliance and Notice of License Application Denial was signed by Tracy Niekamp — "the designee of a designee of a designee of the Director."  Thus, Appellant argues that the AHC erred in denying it a license to operate because the DHSS's decision to deny Appellant a license was not made by the DHSS's director or his/her designee.  Appellant's argument is without merit.

Contrary to Appellant's assertion, the "Notice of Noncompliance and Notice of License Application Denial" was signed by Matt Younger, Section Administrator for Long Term Care Regulation.[3]  The Section for Long Term Care Regulation is the agency

---

[3]  The notice contained the typed signature of "Matt Younger, Section Administrator, Section for Long Term Care Regulation," directly above which Niekamp signed, "Tracey Niekamp for Matt Younger." Younger authorized Niekamp to sign on his behalf.  *Porter v. R.J. Boyd Pav. & Const. Co.*, 112 S.W. 235, 238 (Mo. 1908) (Stating the general rule that "when a document is required by the common law or by statute to be 'signed' by any person, a signature of his name in his own proper or personal handwriting is

6

within the DHSS that administers licensing for long term care facilities. Thus, under the DHSS's organizational structure, Younger was the director's designee to perform DHSS functions related to the regulation of long term care facilities.

More fundamentally, Appellant's argument is inconsequential to our review of the AHC's decision to deny Appellant a license to operate. When an applicant appeals the DHSS's denial of a license to the AHC, the issue is not whether the DHSS's denial was proper. Rather, the issue before the AHC is whether the applicant is entitled to a license, and the applicant bears the burden of proof on such issue. § 621.120; *Dep't of Soc. Servs. v. Mellas*, 220 S.W.3d 778, 783 (Mo. App. 2007) ("The [AHC] actually steps into the [DHSS]'s shoes and becomes the [DHSS] in remaking the [DHSS]'s decision."). Here, whether the Notice of Noncompliance and Notice of License Application Denial was signed by the proper party has no bearing on whether Appellant is entitled to a license to operate and, consequently, has no bearing on whether the AHC's decision to deny Appellant a license was erroneous. Accordingly, Point I is denied.

### Point II — Whether Appellant was entitled to informal dispute resolution

In Point II, Appellant asserts that the AHC erred in denying it an operating license because Appellant was "entitled to an opportunity to an Informal Dispute Resolution ("IDR") process to challenge . . . [the] Statement of Deficiencies," and "the DHSS failed to notify Appellant of the Availability of the IDR rights." As the source of its right to IDR, Appellant cites to 42 C.F.R. § 488.331(a)(1), which provides: "For non-Federal

---

not required. . . . [He] m[ay] request another to sign his name for him.").

[inspections], the State must offer a facility an informal opportunity, at the facility's request, to dispute survey findings upon the facility's receipt of the official statement of deficiencies."

We are not persuaded by Appellant's argument. 42 C.F.R. Sections 488.300–335 — regulations that accompany the Social Security Act — relate to "requirements for surveying [nursing facilities] to determine whether they meet the requirements for participation in the Medicare and Medicaid programs." 42 CFR § 488.300. Thus, 42 C.F.R. Section 488.331 does not apply to Appellant's entitlement to a long term care operating license issued by the State. Accordingly, Appellant was not entitled to an IDR process to challenge the February and April 2009 SoDs.[4] Point II is denied.

### Point III — Whether the April 2009 SoD was inadmissible hearsay

In its Point III, Appellant asserts that the AHC erroneously admitted the April 2009 SoD over Appellant's hearsay objection.[5] In particular, citing to Section 490.680, Appellant argues that the April 2009 SoD does not qualify for the business record hearsay exception because it was "not prepared at or near the time of the [reinspection]." While Section 490.680 does require "[a] record of an act" to be made "at or near the time of the act" in order for such record to qualify under the business record exception, Section 490.680 is not applicable to administrative proceedings. See *State ex rel. Sure-Way Transp., Inc. v. Div. of Trans. Dep't*, 836 S.W.2d 23, 26 (Mo.

---

[4] In 2009, the Legislature did enact the "Missouri Informal Dispute Resolution Act," which requires the DHSS to establish an IDR process and to include a notification of such process with the transmittal of SoDs. § 198.545. The Act, however, did not become effective until August 28, 2009 — months after the SoDs that are the subject of this current action were issued.

[5] In the Point Relied On, Appellant does not clarify which SoD it believes constitutes inadmissible hearsay. As best we can discern from the record, the April 2009 SoD was the only SoD Appellant objected to on hearsay grounds.

App. 1992). Rather, Section 536.070(10) governs the admissibility of business records in an administrative hearing.

Section 536.070(10) "relaxes [the business record requirements] and permits admission of the document 'if it shall appear that it was made in the regular course of any business.'" *Sure-Way*, 836 S.W.2d at 26 (*quoting* § 536.070(10)). Section 536.070(10) further provides that "[a]ll other circumstances of the making of such . . . record . . . may be shown to affect the weight of such evidence, but such showing shall not affect its admissibility." Therefore, whether the April 2009 SoD was prepared near the time of the reinspection is irrelevant to the SoD's admissibility.

Appellant suggests that the April 2009 SoD was not made in the regular course of business and, thus, failed to even meet the relaxed business record requirements for administrative hearings. Appellant claims that the DHSS "admitted that it decided not to license [Appellant] before conducting the February 2009 inspection." Thus, Appellant argues that the April 2009 SoD was "created to justify the decision the [DHSS] had already made," rather than in the regular course of business. Yet, Appellant fails to point to any evidence to support its claim that the DHSS prematurely decided to deny Appellant a license. Point III is therefore denied.

### Point IV — Whether the statutory definition of "substantial compliance" is void for vagueness

Under Section 198.022.1(2), in order to obtain a license to operate, a facility must be "in substantial compliance with the provisions of section 198.003 to 198.096 and the standards established thereunder." Appellant argues, in Point IV of this appeal, that the AHC's decision to deny Appellant a license must be reversed because the definition of

9

"substantial compliance" is "void for vagueness" in that it "fails to give adequate notice as to the proscribed conduct and thus violates due process."

"'The void for vagueness doctrine ensures that laws give fair and adequate notice of proscribed conduct and protects against arbitrary and discriminatory enforcement.'" *State ex rel. Nixon v. Peterson*, 253 S.W.3d 77, 81 (Mo. banc 2008) (quoting *Cocktail Fortune, Inc. v. Supervisor of Liquor Control,* 994 S.W.2d 955, 957 (Mo. banc 1999)). "'The test in enforcing the doctrine is whether the language conveys to a person of ordinary intelligence a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.'" *Id.* (quoting *Cocktail Fortune*, 994 S.W.2d at 957). "The language is to be evaluated by applying it to the facts at hand." *Id.*

Here, the AHC interpreted the statutory term "substantial compliance" to mean, as it pertains to this case, "no uncorrected class II violations." Appellant asserts that the AHC's interpretation of "substantial compliance" under the Act is "unsupported by the precedent and is inconsistent with the statutory scheme." Quite the contrary, the regulations codified under the Act incontestably support the AHC's interpretation of "substantial compliance." 19 CSR § 30-82.020(4) states:

> When a [class II] violation is noted, the operator shall either correct the violation immediately or prior to the time of the reinspection or shall be correcting it in accordance with the time schedules set out in the operator's approved plan of correction, as provided for under section 198.026.2. *If not . . . the violation will constitute substantial noncompliance under the Omnibus Nursing Home Act.*

Applying this regulation to the facts at hand, the requirements of substantial compliance under the Act are readily understood. This regulation gave Appellant reasonable notice

10

that it was not in substantial compliance with the Act by failing to correct the class II violations cited in the February 2009 SoD prior to the time of the reinspection.

Despite the AHC's interpretation of "substantial compliance" being explicitly supported by 19 CSR § 30-82.020(4), Appellant contends that such definition is "inconsistent with the Supreme Court's precedent in *Villines*." In *Villines*, the DHSS revoked a facility's license based on a single incident that resulted in four class I violations, three of which were corrected the day of the incident. 722 S.W.2d 939. On appeal, the Supreme Court reversed the AHC's decision, holding that:

> On the facts of this case, we believe that the legislature intended something more than a single incident which is not in itself life-threatening, and which, if corrected within a reasonable amount of time, presents no "imminent danger to the health, safety, or welfare of any resident" as grounds for license revocation.

*Id.* at 947. Citing to the *Villines* holding, Appellant suggests that the AHC's interpretation of "substantial compliance" in the instant case — that one uncorrected class II deficiency constitutes substantial noncompliance — is incorrect because "a single incident" of noncompliance is not sufficient to constitute substantial noncompliance. Appellant's reliance on *Villines*, however, is misplaced as *Villines* is inapplicable to the case at bar. First, *Villines* deals with class I violations, which are statutorily distinct from the class II violations at issue here. § 198.085; 19 CSR § 30-82.020. Second, *Villines* addresses the requirements for revoking an already existing license, while the instant case is about the denial of a license application — also two

11

statutorily distinct actions.[6]  Thus, the AHC's interpretation of "substantial compliance" is not inconsistent with the Supreme Court's holding in *Villines.*  Point IV is denied.

***Points V & VI — Whether Appellant was in substantial compliance***

In Points V and VI, Appellant contends that the AHC erred in denying Appellant a license because Appellant was in substantial compliance with the Act.  As previously discussed under Point IV, "*a* [class II] violation" left uncorrected "will constitute substantial noncompliance under the Omnibus Nursing Home Act."  19 CSR § 30-82.020(4) (emphasis added).  Thus, all that is needed in order to deny a facility a license to operate is one uncorrected class II violation.  Here, the AHC's decision to deny Appellant a license was based on five uncorrected class II violations: (1) failure to have electrical wiring inspected every two years, 19 CSR § 30-86.032(13); (2) failure to provide a licensed nursing home administrator, 19 CSR § 30-86.043(2); (3) failure to ensure that the facility followed all applicable rules and regulations, 19 CSR § 30-86.043(4); (4) failure to maintain a sufficient number of staff, 19 CSR § 30-86.043(24)(A); and (5) failure to follow physician orders, 19 CSR § 30-86.043(35).  We will address Appellant's specific arguments concerning each of the cited uncorrected class II deficiencies in turn.[7]

---

[6]  Under Section 198.022, a facility must be in substantial compliance with the requirements of the Act in order to receive an operating license.  Section 198.036.1, however, lists more specific deficiencies that must exist in order for the DHSS to revoke a license *that has already been issued*.  In *Villines*, the issue before the Court was whether the facts justified the revocation of the subject facility's already existing license "under § 198.036."  722 S.W.2d at 943.

[7]  Under its Point VI, Appellant also takes issue with the meaning of the term "uncorrected."  Specifically, "whether the term 'uncorrected' included: (a) a continuation of the same deficiency on a re-inspection; or (b) a new example of a deficiency of the type cited before (i.e. new facts, same [regulation]) at re-inspection."  The AHC took the position that an uncorrected deficiency can be supported by new facts.

12

(1)     <u>Failure to Inspect Electrical Wiring Every Two Years, 19 CSR § 30-86.032(13)</u>

19 CSR § 30-86.032(13) provides, in relevant part: "[Facilities'] electrical wiring shall be maintained in good repair and shall not present a safety hazard.  All facilities shall have wiring inspected every two (2) years by a qualified electrician."  The February 2009 SoD cited Appellant for "fail[ing] to ensure an electrical inspection was completed every two years."  The April 2009 SoD cited Appellant for not correcting its violation of 19 CSR § 30-86.032(13).

Appellant asserts five arguments in an attempt to prove that the AHC erred in finding that Appellant violated 19 CSR § 30-86.032(13) in both the February and April 2009 SoDs.  First, Appellant suggests that it never violated 19 CSR § 30-86.032(13) in the first place and that, therefore, the February 2009 SoD's citation to such deficiency was improper.  Appellant presented to the AHC a SoD that was issued to the Facility in April 2008 — prior to Appellant's purchase of the Facility.  Appellant attempts to argue that the April 2008 SoD proves that an electrical inspection was conducted within two years of February 2009 because it does not contain any violations of 19 CSR § 30-86.032(13).  Appellant's reasoning is logically flawed.  If an electrical inspection had been completed in May 2006, for example, then an inspection would have been

<hr>

It is unclear whether Appellant is making another "void for vagueness" argument or challenging the AHC's interpretation of the term "uncorrected."  Either way, we do not address Appellant's argument because Appellant's substantial noncompliance with the Act stands under both meanings of the term suggested by Appellant.  Appellant had three uncorrected class II violations based on a continuation of the same deficiency (failure to have electrical wiring inspected every two years, failure to provide a licensed nursing home administrator, and failure to ensure that the facility followed all applicable rules and regulations), and two uncorrected class II violations based on new facts (failure to maintain sufficient number of staff and failure to follow physician orders).  Thus, regardless of the meaning of "uncorrected," Appellant did not substantially comply with the Act.

13

conducted within two years of the April 2008 SoD, but not within two years of the February 2009 SoD.

Second, Appellant asserts that, because an electrical inspection was required every two years, "it was an error to require this inspection in the first year of the operation by [Appellant]." 19 CSR § 30-86.032(13) makes no reference to the management of a facility, but rather focuses on the actual physical structure of the facility instead. Meaning, the length of a certain operator's tenure at a facility is irrelevant to the requirement that the facility's electrical wiring be inspected every two years. Here, the only reason Appellant was required to have an inspection performed in order to show substantial compliance was because Appellant was unable to provide the DHSS with any inspection records predating Appellant's management of the Facility.

Third, Appellant contends that its violation of 19 CSR § 30-86.032(13) was corrected by the April 2009 SoD. At the AHC hearing, Appellant presented a receipt from an electrical contractor dated April 27, 2009, which stated that an inspection of the "electrical panels, outlets, [and] equipment" was performed. Based on this receipt, Appellant argued that its violation of 19 CSR § 30-86.032(13) had in fact been corrected by the April 2009 SoD.

The AHC rejected Appellant's argument, pointing to additional notes on the contractor's receipt that stated: "Attached sheet needs to be corrected items. SEE EXIBIT A." Appellant did not provide the AHC with the attached exhibit; thus, the AHC reasoned:

> [I]t is not enough to satisfy the intent of the Omnibus Nursing Home Act that a facility merely be inspected — it is inspected to prove that it is safe for residents to live in and staff to use. [Appellant]'s failure to include Exhibit A to the receipt makes us question his candor, and that failure,

14

along with its failure to show compliance with the remainder of the regulation (i.e., that the facility was in good repair and not a safety hazard) means that he failed in burden of proving that it had complied with this Regulation.

Reading 19 CSR § 30-86.032(13) as a whole, we agree with the AHC that it is not enough for Appellant to merely show that an inspection was completed to establish compliance with 19 CSR § 30.86.032(13).  See *Neske v. City of St. Louis*, 218 S.W.3d 417, 426 (Mo. banc 2007) ("[O]ne part of a statute or ordinance should not be read in isolation, but rather in the context of the whole act, and should be read to harmonize all provisions and give effect to every word, sentence, and clause of the legislation, if reasonably possible."), overruled on other grounds by *King-Willman v. Webster Groves Sch. Dist.*, 361 S.W.3d 414, 417 n.4 (Mo. banc 2012).  The inspection requirement would be meaningless if not accompanied with the requirement that the results of the inspection rendered the facility's electrical wiring in good repair and not a safety hazard.  Here, the receipt shows that electrical deficiencies were found, but Appellant did not provide the attached exhibit that likely would have established the extent of such deficiencies.  Additionally, Appellant did not make any effort to prove that the items that "need[ed] to be corrected," were in fact corrected.  Therefore, the AHC did not err in finding the proffered receipt insufficient to prove that the electrical inspection violation had been corrected.

Fourth, Appellant asserts that Chaganti has a bachelor's and master's degree in electrical engineering and, consequently, that "[t]he AHC having no expertise in electrical engineering . . . should have deferred to [Chaganti's] expert testimony" that "there were no problems with the electrical systems of the facility."  Appellant's argument is unavailing.  Chaganti's testimony was not proffered as expert testimony,

15

and the requisite foundation was not established.  In addition, Chaganti's degrees do not establish that he is a "qualified electrician," as required by 19 CSR § 30-86.032(13). Moreover, Chaganti did not testify that the Facility's electrical wiring was in good condition based on his own inspection of the Facility. Rather, all that Chaganti stated was that the Facility "passed all inspections."  Yet, to the extent Chaganti did testify that the Facility's electrical wiring was in good condition, it was entirely reasonable for the AHC to find his testimony incredible.

Finally, Appellant contends that the AHC arbitrarily classified the subject deficiency as a class II violation.  As set out at the beginning of this opinion, violations of the Act are classified in accordance "to the degree of harm a resident may suffer as a result of violation of the standard."  *Villines*, 722 S.W.2d at 941 n.2.

Each standard under Section 198.085 of the Act is followed by a roman numeral, which identifies the class assigned to the standard.  19 CSR § 30-82.020(1).  There are "instances where a particular rule, section, subsection, or portion of a rule is followed by a notation consisting of more than one (1) Roman numeral."  19 CSR § 30-82.020(2). In those instances, "the lower classification shall be applied unless the [DHSS] can show that the higher classification is merited because of the extent of the violation, the violation[']s effect on residents or the impact when combined with other deficiencies." *Id.*

In the instant case, of the five uncorrected class II violations upon which Appellant's license application was denied, two were "upcoded" from being class III violations.  One such violation was Appellant's failure to have electrical wiring inspected

every two years.  The reason provided by the DHSS for the higher classification was "the impact when combined with other deficiencies."

Appellant argues that the DHSS's higher classification was an "arbitrary and capricious application of the law."  Appellant asserts that the classification was arbitrary because the DHSS "simply recited the regulatory language . . . without showing how a degree of harm was enhanced by the mere existence of other unrelated deficiencies."  Thus, Appellant takes issue with the fact that, in explaining the higher classification, the DHSS "alleged conclusions rather than evidence."  We find Appellant's position unpersuasive.

First, all that the regulation requires is that the DHSS provides, in the SoD, "for what reason" the higher classification was applied.  19 CSR § 30-82.020(2).  The regulation does not require the DHSS to cite to specific facts supporting the reason.  Thus, the DHSS's classification cannot be determined to be arbitrary simply because the DHSS used regulatory language in justifying the classification.

Second, we find that substantial evidence supports the reason cited by the DHSS — "the impact when combined with other deficiencies" — for applying the higher classification to Appellant's failure to have the Facility's electrical wiring inspected every two years.  In both the February and April 2009 SoDs, Appellant was also cited for fire safety violations.[8]  Electrical safety and fire safety are clearly closely related in that

---

[8]  Regarding the February 2009 SoD, Appellant was also cited for failing to have sufficient staff on duty to meet fire safety standards, 19 CSR § 30-86.043(24)(A).  Regarding the April 2009 SoD, Appellant was also cited for "fail[ing] to have a complete fire alarm system which automatically transmitted to the fire department, dispatching agency, or central monitoring company; and, failed to have visual signals in the facility," 19 CSR § 30-86.022(8)(B); "fail[ing] to maintain separation between the first and second floors by ensuring one of one smoke separation doors remained closed at all times," 19 CSR § 30-86.022(10)(G); "fail[ing] to maintain one of two ovens . . . in good condition," 19 CSR § 30-86.032(22); and "fail[ing] to

17

faulty electrical wiring presents a fire hazard. Thus, the degree of harm a resident might suffer as a result of Appellant's failure to have the facility's electrical wiring inspected every two years is greater when combined with Appellant's fire safety violations. Accordingly, the DHSS's upcoding of the subject violation is supported by substantial evidence and was not arbitrary.

For all these reasons, the AHC did not err in finding that Appellant was in violation of 19 CSR § 30-86.032(13) in both the February and April 2009 SoDs.

(2)     Failure to Provide a Licensed Nursing Home Administrator, 19 CSR § 30-86.043(2)

19 CSR § 30-86.043(2) provides: "A person shall be designated to be an administrator who is currently licensed as an administrator by the Missouri Board of Nursing Home Administrators." Both the February and April 2009 SoDs cited Appellant for "fail[ing] to provide an Administrator who was responsible for the management and operations of the facility."

Liza Pequeno was the Facility's administrator at the time it was purchased by Appellant. On October 18, 2008, Pequeno left and Appellant hired Robert Elkow as the Facility's administrator. On October 27, 2008, during an investigation of an abuse complaint that the DHSS received prior to Appellant's purchase of the Facility, Theresa Forbes, a DHSS investigator, approached Elkow in an adversarial manner and demanded to know what he intended to do about the alleged abuse incident. Forbes was not satisfied with Elkow's first response — that he would investigate the incident and act appropriately — but instead was only satisfied when Elkow said he would fire

_____

have sufficient staff on duty during the day and evening shifts to meet the staffing requirements for fire safety," 19 CSR § 30-86.043(24)(A).

the nurse's aide who allegedly committed the act of abuse. Elkow testified that he had never experienced anything so inquisitorial in his 35-plus years in his profession.

Then, on October 31, 2008, Cassie Blum, another DHSS investigator, also took an adversarial tone with Elkow regarding the alleged incident of abuse, telling him that "facilities can lose their license, administrators can lose their license over not giving appropriate care to residents." As a result of his interactions with Forbes and Blum, Elkow immediately resigned because he felt "very intimidated" and was worried that the DHSS would discipline him for an incident that occurred before he arrived at the Facility.

On November 4, 2008, Wolfgang Volz became the Facility's administrator but left within a month without giving notice. Then, Faye Bourisaw became the administrator in mid-December 2008. Bourisaw held her position as administrator until January 2, 2009 when, in her words, she "took [her] license off the wall," and told Chaganti that she was leaving because, "[she] w[ould] not be a party to poor care."

In the February 2009 SoD, the DHSS cited Appellant for "fail[ing] to provide an Administrator who was responsible for the management and operations of the facility." As part of its plan of correction in response to the February 2009 SoD, Appellant assured the DHSS that it would hire an administrator by April 30, 2009. On April 10, 2009, Chaganti applied to the Board of Nursing Home Administrators (the "BNHA") for a Temporary Emergency License in an attempt to obtain an administrator's license for himself. Chaganti's application was subsequently denied as insufficient. Thus, in the April 2009 SoD, Appellant was cited again for failing to provide an administrator.

Appellant asserts five arguments in an attempt to prove that the AHC erred in finding that Appellant violated 19 CSR § 30-86.043(2). First, Appellant argues that 19

19

CSR § 30-86.043(2) did not apply to the Facility and, thus, it was not required to have a licensed nursing home administrator. Appellant argues that 19 CSR § 30-86.042(2) was the standard to which it should have been held. 19 CSR § 30-86-042(2) provides, in relevant part, that "[f]or a residential care facility, a person shall be designated as administrator/manager who is either currently licensed as a nursing home administrator *or is at least twenty-one (21) years of age.*"

Appellant's first argument is without merit. 19 CSR § 30-86.042(2) provides the minimum administrative requirements for a long term care facility. 19 CSR § 30-86.043 then provides additional standards that must be met in order to receive a license to operate as a Residential Care Facility II — a specific type of long term care facility under the Act.[9] 19 CSR § 30-86.043(1). Here, Appellant applied for a license to operate as a Residential Care Facility II and, thus, was required to designate a person as an administrator "who is currently licensed as an administrator by the Missouri Board of Nursing Home Administrators." 19 CSR § 30-86.043(2).

Second, Appellant contends that "the AHC erred in not ruling that the [DHSS] is estopped from asserting the lack of an administrator or nurse as a deficiency because it caused Elkow to resign." The AHC found Elkow's testimony — regarding the circumstances of his departure — credible and that the DHSS "manifested an antagonistic attitude toward [Appellant]." Nevertheless, the AHC further found that

---

[9] A Residential Care Facility II ("RCF II") is a specific type of long term care facility under the Act. In 2006, the legislature replaced RCF II licenses with licenses to operate as Assisted Living Facilities ("ALF"). Under the regulations, if a facility was licensed as a RCF II on August 27, 2006, it can elect to be inspected under the RCF II standards in effect in 2006, or it can be inspected under the ALF standards in effect in 2007. *See* 19 CSR § 30-86.043(1); 19 CSR § 30-86.047(1); § 198.005.

In the instant case, the Facility had been previously licensed as a RCF II. In its application for a license to operate a long term care facility, Appellant elected to continue to meet all laws, rules, and regulations that were in placed on August 27, 2006 regarding an RCF II.

20

"simply proving that [the DHSS]'s employees were bad actors does not prove that [Appellant] is entitled to licensure."

Agreeing with the AHC's finding, we again are mindful that the issue before the AHC was whether Appellant was entitled to licensure. While two DHSS investigators may have acted oppositional or combative towards one of the many administrators that came and went at the Facility, such demeanor is irrelevant to the fact that the Facility failed to have an administrator at the time of the February 2009 and April 2009 SoDs. Appellant was not cited for failing to have an administrator on November 1, 2008 — the day after Elkow resigned. Rather, two different individuals held the position of administrator after Elkow, and the Facility had been without an administrator for four weeks leading up to the February 2009 SoD. Then, at the time Appellant was cited in the April 2009 SoD for failing to correct the deficiency, it had operated an additional twelve weeks without an administrator, despite its assurance to provide an administrator by April 30, 2009. To the extent the DHSS investigators influenced Elkow's decision to resign, such influence is far too attenuated from the cited violations to render the AHC's finding erroneous. Thus, the AHC did not err in "failing to rule that the DHSS is estopped from asserting the lack of an administrator as a deficiency."

Third, Appellant asserts that the Facility did in fact have an administrator at the time of the February 2009 SoD and, thus, that "the citation to the lack of an administrator in the April 2009 SoD [s]hould have been a 'new' deficiency and not an 'uncorrected' deficiency." In support of its assertion, Appellant cites to Chaganti's testimony that Bourisaw did not quit, but rather that she was on medical leave of absence at the time of the February 2009 SoD. The AHC, however, specifically found

21

no credibility in "Chaganti's versions of the events" surrounding Bourisaw's exit and chose instead to believe Bourisaw's testimony that she quit at the beginning of January. Giving deference to this credibility determination, we find sufficient evidence to support the AHC's finding that the Facility did not have an administrator at the time of the February 2009 SoD. *Mo. Real Estate Appraisers Comm'n v. Funk*, 306 S.W.3d 101, 105 (Mo. App. 2010).

Fourth, Appellant argues that the DHSS improperly interfered with Appellant's compliance when the BNHA — a division of the DHSS — denied Chaganti's application for a Temporary Emergency License ("TEL"). The BNHA's denial letter to Chaganti listed several reasons for its decision, including Chaganti's failure to (1) provide proof of high school diploma or equivalency certificate (GED); (2) provide proof of college transcripts; (3) provide proof of good moral character; (4) provide a recent photograph; and (5) file his TEL application within 10 working days of Bourisaw's vacation of the position, as required by 19 CSR § 73-2.080(1)(F). While the AHC found the first four reasons stated to be insufficient to support the denial Chaganti's TEL, it did find Chaganti's failure to apply within ten days of Bourisaw's resignation sufficient.

19 CSR § 73-2.080(1)(F) provides: "Applications for a temporary emergency license shall be filed with the board immediately upon notification of, or realization by, the person making the application, but in no event more than ten (10) working days from the [date of the death, removal, or vacancy of the licensed administrator at the facility where the emergency exists]." Here, Bourisaw was the last licensed administrator at the Facility prior to Chaganti's TEL application. Bourisaw terminated her employment at the beginning of January 2009, and Chaganti did not apply for a TEL until April 10,

22

2009.  Consequently, the DHSS did not improperly interfere with Appellant's compliance when the BNHA denied Chaganti's application for a TEL.

Finally, Appellant contends that it was in compliance with 19 CSR § 30-86.043(2) *at the time of the AHC hearing* because it "presented evidence that it had Bob Elkow as an Administrator and nurse."  This contention is unsupported by the record.  Chaganti testified that he had no employment contract with Elkow.  And while Elkow did answer affirmatively to Chaganti's hypothetical question about whether he was "willing and able to work for Whispering Oaks *if it is open*," the Facility had not been open since January 2010.

For all these reasons, the AHC did not err in finding that Appellant was in violation of 19 CSR § 30-86.043(2) in both the February and April 2009 SoDs.

(3)    Failure to Ensure Compliance with All Rules and Regulations, 19 CSR § 30-86.043(4)

19 CSR § 30-86.043(4) provides:

The operator shall be responsible to assure compliance with all applicable laws and regulations.  The administrator shall be fully authorized and empowered to make decisions regarding the operation of the facility and shall be held responsible for the actions of all employees.  The administrator's responsibilities shall include oversight of residents to assure that they receive appropriate care.

In both the February and April 2009 SoDs, the DHSS cited Appellant for "fail[ing] to ensure the facility followed all rules and regulations," in violation of 19 CSR § 30-86.043(4).  Appellant attacks the AHC's finding that Appellant "violated Regulation 19 CSR § 30-86.043(4) in both SoDs on three grounds.  First, Appellant argues that 19 CSR § 30-86.043(4)'s "all applicable laws and regulations" language should be declared void for vagueness. In support of its argument, Appellant asserts:

23

> "[A]ll applicable laws and regulations" may mean labor laws, immigration laws, contract laws, tort laws, environmental laws etc. The scope of the term "all applicable laws and regulations" being infinite, it [allows] an inspector to cite unrelated violations and seek to sanction a facility, such as, for example, failure to pay overtime pay to a worker or for allegation of racial harassment by a worker.

We disagree and find that the "language conveys to a person of ordinary intelligence a sufficiently definite warning as to the proscribed conduct." *Nixon*, 253 S.W.3d at 81 (quoting *Cocktail Fortune*, 994 S.W.2d at 957). Contrary to what Appellant's argument suggests, 19 CSR § 30-86.043(4) does not require a facility's administrator to assure compliance with any and all laws ever enacted. Rather, the regulation states that the administrator "shall be responsible to assure compliance with all *applicable* laws and regulations." (Emphasis added).

The clear purpose of the Act is to "protect[ ] . . . the health, safety, and welfare of [the] large and increasing nursing home population." *Stiffelman*, 655 S.W.2d at 528; *Villines*, 722 S.W.2d at 944. Thus, construing the "all applicable laws and regulations" language within the context of the legislature's purpose in enacting the law, *Bohr v. Nodaway Valley Bank*, 411 S.W.3d 352, 356 (Mo. App. 2013), the language's meaning is apparent: those which are designed to protect the health, safety, and welfare of nursing home residents. We also note that such meaning does not render the scope of the term infinite, as asserted by Appellant. To use Appellant's examples, the failure to pay overtime to a worker has no direct bearing on the adequacy of care for nursing home residents and, consequently, could not serve as a basis for a cited deficiency under the Act. A nursing home worker's racial harassment of a resident, however, undoubtedly falls within the logical scope of the protection of nursing home residents.

24

Such relation is demonstrated by numerous regulations under the act, including 19 CSR § 30-88.010(29), which provides that "[e]ach resident shall be treated with consideration, respect, and full recognition of his or her dignity and individuality;" and 19 CSR § 30-88.010(22), which provides that "[e]ach resident shall be free from . . . the infliction of physical, sexual, or emotion injury."

Second, similar to the electrical inspection violation, Appellant contends that the AHC arbitrarily classified its violation of 19 CSR § 30-86.043(4) as a class II deficiency. Again, the reason cited by the DHSS for the higher classification was "the impact when combined with other deficiencies." The AHC found that the DHSS's justification was supported by the staffing deficiencies found in both the February and April 2009 SoDs. Not only was Appellant cited for several staffing deficiencies, it was also found to have violated various regulations relating specifically to patient care.[10] Therefore, we agree

---

[10] Regarding the February 2009 SoD, Appellant was also cited for "fail[ing] to provide an Administrator who was responsible for the management and operations of the facility," 19 CSR § 30-86.043(2); "fail[ing] to ensure resident rooms were cleaned daily," 19 CSR § 30-86.032(23); "fail[ing] to keep floors in resident rooms, resident use bathrooms and hallways clean," 19 CSR § 30-87.020(12); "fail[ing] to maintain walls and baseboards clean and in good repair in resident use bathrooms, the kitchen, facility entryway and hallways," 19 CSR § 30-87.020(15); "fail[ing] to keep sinks, faucets and toilets in resident use bathrooms clean and in good repair," 19 CSR § 30-87.020(45); "fail[ing] to ensure employees kept their hands clean and washed them as much as necessary while handling potentially hazardous food," 19 CSR § 30-87.030(2); "fail[ing to store food above the floor," 19 CSR § 30-87.030(15); "fail[ing] to ensure open food containers were stored to prevent contamination," 19 CSR § 30-87.030(16); failing to ensure staff wore identification, 19 CSR § 30-86.043(14); "fail[ing] to maintain adequate number and type of staff in the facility to monitor and provide care to meet the needs of the residents and maintain upkeep of the facility," 19 CSR § 30-86.043(24)(A); "fail[ing] to follow physician's orders," 19 CSR § 30-86.043(35); failing to handle residents' controlled substances according to state laws, 19 CSR § 30-86.043(53); failing to plan residents' meals, 19 CSR § 30-86.052(6); "fail[ing] to ensure residents had the right to make treatment and health-care decisions," 19 CSR § 30-88.010(10); "fail[ing] to ensure residents had access to their personal funds," 19 CSR § 30-88.020(3); "fail[ing] to ensure a quarterly written statement of the resident fund account . . . was given to the resident," 19 CSR § 30-88.020(9); and failing to perform criminal background checks on employees prior to hire, § 660.317.3.

Regarding the April 2009 SoD, Appellant was cited for "fail[ing] to provide protective oversight for [residents] . . . who exhibited inappropriate behaviors," 19 CSR § 30-86.043(34). Appellant was also cited for the following uncorrected violations from the February 2009 SoD: "fail[ing] to provide an Administrator who was responsible for the management and operations of the facility," 19 CSR § 30-86.043(2); failing to have sufficient staff on duty, 19 CSR § 30-86.043(24)(A); "fail[ing] to follow physician's orders," 19 CSR § 30-86.043(35); failing to handle residents' controlled substances according to state laws, 19 CSR § 30-

25

that the degree of harm the Facility's residents might suffer as a result of Appellant's violation of 19 CSR § 30-86.043(4) was in fact greater when combined with the numerous other violations that did occur. Therefore, the AHC's upcoding of the subject violation is supported by substantial evidence and was not arbitrary.

Finally, Appellant asserts that its cited violation of 19 CSR § 30-86.043(4) in the April 2009 SoD was improperly characterized as an "uncorrected" deficiency because one of the reasons provided for the deficiency — Appellant's failure to test the drinking water — was not cited in the February 2009 SoD. Yet, the AHC's finding that Appellant was in violation of 19 CSR § 30-86.043(4) would stand without Appellant's failure to test the drinking water. In the February 2009 SoD, the DHSS cited to Appellant's failure (1) to provide an administrator, and (2) ensure sufficient oversight, as the basis for Appellant's violation of 19 CSR § 30-86.043(4). Those two failures remained uncorrected at the time of the April 2009 SoD. Accordingly, the April 2009 SoD did not improperly characterize Appellant's violation of 19 CSR § 30-86.043(4) as "uncorrected."

For all these reasons, the AHC did not err in finding that Appellant was in violation of 19 CSR § 30-86.043(4) in both the February and April 2009 SoDs.

(4)     Failure to Have an Adequate Number of Personnel — 19 CSR § 30-86.043(24)(A)

19 CSR § 30-86.043(24)(A) provides: "The facility shall have an adequate number and type of personnel for the proper care of residents and upkeep of the

---

86.043(53); "fail[ing] to ensure residents had access to their personal funds," 19 CSR § 30-88.020(3); and failing to perform criminal background checks on employees prior to hire, § 660.317.3.

facility." Specifically, 19 CSR § 30-86.043(24)(A) requires, at a minimum, a staff-to-resident ratio of one to fifteen during the day shift, one to twenty during the evening shift, and one to twenty-five during the night shift.[11] 19 CSR § 30-86.043(24)(A). Both the February and April 2009 SoDs cited Appellant for failing to satisfy 19 CSR § 30-86.043(24)(A). On appeal, Appellant only challenges the AHC finding of staffing deficiencies as it pertains to the April 2009 SoD. Appellant presents three arguments in support of its position.

First, Appellant argues that a facility's administrator should be counted toward the number of staff.[12] This argument fails, however, due to the fact that the Facility was without an administrator on the days for which it was found to have insufficient staff. Second, Appellant contends that Chaganti, as owner of the Facility, should be counted toward the number of staff. Yet, Appellant provided no evidence of Chaganti's presence in the Facility at any of the times in question. Finally, Appellant points to photocopies of time cards from contract workers, arguing that such workers should count towards the number of staff. Appellant's argument is again futile as, even when considering the contract workers, the Facility was still short of the regulatory requirement. Additionally, as noted by the AHC, the contracted workers spoke little English and, thus:

> Considering that one of the reasons stated in the regulation for having sufficient staff was fire safety, and considering that [the DHSS] discovered several issues with regard to fire safety in the building in both the February and April inspections, we wonder how effective these contract workers

---

[11] Under 19 CSR § 30-86.043(24)(A), the day shift if from 7 a.m. to 3 p.m., the evening shift is from 3 p.m. to 9 p.m., and the night shift if from 9 p.m. to 7 a.m.

[12] 19 CSR § 30-86.043(24)(C) provides: "In a facility of more than one hundred (100) residents, the administrator shall not be counted when determining the personnel required." Thus, Appellant contends that administrators can be counted for facilities with less than 100 residents.

27

would be in helping the residents in case of emergency, and if they had received appropriate training.

For all these reasons, the AHC did not err in finding that Appellant was in violation of 19 CSR § 30-86.043(24)(A) in both February and April 2009 SoDs.

(5)     Failure to Follow Physician Orders — 19 CSR § 30-86.043(35)

19 CSR § 30-86.043(35) provides: "Residents shall receive proper care to meet their needs.  Physician orders shall be followed."  In the February 2009 SoD, the DHSS stated that the Facility "failed to follow physician's orders for three of the seven sampled residents."  As part of the April 2009 investigation, the DHSS sampled five residents and found that the Facility failed to follow physician orders for four of the sampled residents. Appellant presents three arguments in support of its contention that the AHC erred in finding that Appellant violated 19 CSR § 30-86.043(35) in both the February and April 2009 SoDs.

First, Appellant points to DHSS investigator Blum's testimony that she was not the particular investigator who cited the subject deficiency and asserts that, based on such testimony, the "DHSS waived this alleged defect."  However, this allegation is unsupported as our review of Blum's testimony reveals nothing to even suggest that DHSS waived Appellant's violation of 19 CSR § 30-86.043(35).

Second, Appellant asserts what the AHC described as a "no harm, no foul" argument.  At the hearing, Appellant presented testimony from its medical director that "no patient suffered any harm" as a result of Appellant's failure to follow physician orders.  However, whether any residents suffered harm is not a required factor for consideration under 19 CSR § 30-86.043(35).  Thus, regardless of whether any residents suffered harm, Appellant still violated 19 CSR § 30-86.043(35).

28

Lastly, Appellant contends that it corrected the subject deficiency by the April 2009 SoD. In response to its February 2009 failure to follow physician orders, Appellant placed blame on its staff for not contacting the on-call nurse. By the time of reinspection, Appellant argues that it had a full time nurse on staff and, therefore, the subject deficiency was corrected. The AHC rejected Appellant's argument, reasoning that "the problems with administering prescribed medications to residents continued." We find no error in the AHC's determination that the mere availability of a nurse did not constitute proof of physician orders being followed.

Summarizing our ruling on Appellant's fifth and sixth points, we find substantial and competent evidence to support the AHC's finding that Appellant was not in substantial compliance with the Act. Points V and VI are denied.

### Point VII — Whether licensure denial was the proper response to Appellant's substantial noncompliance

In Point VII, Appellant contends that the AHC erred in denying Appellant an operating license in that it should have chosen to impose one of the "lesser sanctions" provided in Section 198.066. Section 198.066 states:

> To encourage compliance with the provisions of this chapter and any rules promulgated thereto, the department of health and senior services shall impose sanctions commensurate with the seriousness of the violation which occurred. For class I, II, or III violations, the following remedies may be imposed:
>
> (1) A plan of correction;
>
> (2) Additional directed staff training;

29

(3) State monitoring;

(4) A directed plan of correction;

(5) Denial of payment for new Medicaid admissions;

(6) A probationary license and consent agreement as described in section 198.026;

(7) Recovery of civil monetary penalties pursuant to section 198.067;

(8) Denial of payment for all new admissions;

(9) Receivership pursuant to section 198.105; or

(10) License revocation.

The fundamental problem with Appellant's Point VII is that Section 198.066 is a list of remedies that may be imposed to remedy *a violation* of the Act. Here, the AHC's licensure denial was not in response to a violation of the Act. Rather, the AHC denied Appellant a license to operate because it was in *substantial noncompliance* with the Act. Substantial compliance with the Act is a "*requirement[ ]*" that must be "met" before a facility can be issued an operating license. § 198.022(1). Meaning, while Appellant's position is that the AHC should have imposed "one of the lesser sanctions" listed in Section 198.066 *instead* of denying Appellant a license under Section 198.022, the two statutes remedy different — albeit related— ills and, thus, are not interchangeable.[13]

---

[13] As support for its Point VII, Appellant relies heavily on *Villines*, discussed *supra*. As explained in our discussion of Point IV, Appellant's reliance on *Villines* is misplaced. Nevertheless, we will take this opportunity to address a policy concern articulated in *Villines,* wherein the Supreme Court discussed the legislative purpose behind making "less drastic remedies" than license revocation available:

A review of these sanctions, seemingly promulgated to fit the severity of the violation involved, reinforces the position we took in *Stiffelman* that "[t]he legislature no doubt saw the availability of remedies less drastic than the shutdown of a deficient home as being in

30

the best interest of nursing home residents for many of whom forced transfers occasioned by revocation would be dispiriting and even life-threatening."

It is well documented that many nursing home residents suffer from debilitating conditions such as failing health, mental disease, and susceptibility to shock. Those seeking residences in homes designed to meet these special needs find that the availability of beds in well-run facilities continues to decrease as the demand for nursing home care continues to increase. Once settled in a home, the trauma resulting from forced transfer often causes mental and physical set backs. The severity of the complications from "transfer trauma" ranges from mild depression to severe illness and death.

*Villines*, 722 S.W.2d at 945 (citations omitted) (quoting *Stiffelman*, 655 S.W.2d at 530).

The facts of the instant case are unique in that, although they involve application for a license to operate a long term care facility, the subject facility was already operating during the pendency of the application process. When the DHSS denied Appellant a license to operate — and consequently ordered Appellant's temporary permit to operate null and void — the Facility's residents were presumably forced to transfer to other facilities. Thus, while the legal principles set forth in *Villines* are not applicable here, the policy concerns are.

Although we find it important to point out that the policy concerns involved with licensure revocations can be triggered by certain licensure denials as well, the licensure denial in the instant case was not inconsistent with the legislative intent and purpose of the Act. As noted, the Act is aimed at protecting the health, safety, and welfare of nursing home residents. While "transfer trauma" is one factor to consider when carrying out the legislature's intent, we must also consider the potential harms that could result from allowing a facility to continue to operate despite its persistent violations and substandard care. *See* Steve Vosmeyer and Diane Felix, *The Missouri Omnibus Nursing Home Act of 1979: A Legislative History*, 24 ST. LOUIS U. L.J. 617, 633–35 (1981) (explaining that, during the drafting of the Act, "legislative committees found that when a license is not revoked in a substandard home, the patients are truly the ones likely to suffer the most" and, thus, legislature's intent behind the "weapons of revocation [and] not granting a new license" was to give the State the ability to "put a quick stop to inadequate patient care")

Such concerns strongly resonate here in that Appellant failed to demonstrate any interest in the protection of the Facility's residents. As noted by the AHC:

[Appellant] showed no interest in proving its fitness to hold a license, but was quite interested in proving that [the DHSS] and its employees and officers lied, discriminated against Chaganti, and generally conspired against it and Chaganti. . . . [Appellant's] demeanor in the licensing process, and its arguments in this case, indicate a belief that, simply by virtue of buying the facility, it was entitled . . . to the license. . . . Such an attitude ignores the purpose of a license.

. . . .

[Appellant] tested and probed every action and every law, looking for the loophole, and where none existed, it argued for the creation of a new one. . . . [Appellant] made little effort to prove its fitness to be licensed to operate a [long term facility].

31

Insofar as Appellant suggests that the AHC was unduly harsh in its choice of remedies, we note that the AHC not only imposed a "lesser sanction" in denying Appellant licensure, it actually imposed the absolute minimum penalty required under the Act. Section 198.022 required the AHC to deny Appellant a license in response to Appellant's substantial noncompliance. However, the AHC could have, in addition to licensure denial, imposed sanctions under Section 198.066 for any of the violations cited in the April 2009 SoD. § 198.067.5 ("The imposition of any remedy provided for in sections 198.003 to 198.186 shall not bar the imposition of any other remedy."). For example, the AHC could have imposed civil monetary penalties for each of Appellant's thirteen violations. § 198.066(7). And had the AHC chosen to impose monetary penalties, it would have been *required* to fine Appellant *at least* $2450.00, and permitted to fine Appellant up to $10,000.00.[14]

Accordingly, not only was it well within the AHC's discretion to decline to impose any sanctions under Section 198.066, but it would have been an abuse of discretion for the AHC to grant Appellant a license under Section 198.022 in the face of Appellant's substantial noncompliance.[15] Point VII is denied.

---

[14] Under Section 198.067.3, "the amount of the penalty shall be determined as follows":

(2) For each violation of a class II standard, not less than two hundred fifty dollars nor more than one thousand dollars;

(3) For each violation of a class III standard, not less than fifty dollars nor more than two hundred fifty dollars[.]

§ 198.067.3(2) & (3). Here, the April 2009 SoD cited Appellant for nine class II violations and four class III violations.

[15] Appellant contends that its Point VII should be reviewed *de novo* because the AHC "relie[d] on an erroneous interpretation of" Section 198.066 in declining to impose any of the sanctions listed thereunder. We disagree. In declining to impose "one of the lesser sanctions" listed in Section 198.066, the AHC stated: "Further, the denial of licensure was not done on the basis of the existence of Class II violations, but on the existence of Class II violations that were found on both the original inspection and the

32

***Points VIII and IX — Whether the AHC erred in not finding DHSS corruption***

In its Point VIII and IX, Appellant provides a laundry list of perceived wrongs perpetrated by the DHSS, and contends that such acts violated its right to due process. Borrowing language from the AHC's decision, Appellant's contention is nothing more than a baseless "allegation of an ongoing conspiracy against it and against Chaganti personally."

Appellant suggests that the DHSS's licensure denial was in retaliation to the fact that Appellant did not offer any bribes to DHSS investigators. Appellant contends that the AHC "ignore[d] substantial evidence in that [the] evidence clearly shows that one of the key employees of the DHSS admitted to accepting gratuities from [other] facilities inspected." Appellant's contention is completely groundless.

We find no evidence in the record to even suggest that DHSS workers were involved in any sort of bribery conspiracy with long term care facilities in this state. Appellant claims that the AHC "ignored [an] admission of bribery" by a DHSS official. However, the testimony Appellant cites does not support its claim. At the AHC hearing, a DHSS official testified: "[W]e go do inspections at facilities all the time. Sometimes they offer us water and [sandwiches]." Such testimony wholly fails to constitute evidence of corruption or bribery. Moreover, Appellant's argument has no bearing on whether Appellant was entitled to licensure under the Act.

In addition, Appellant claims that the DHSS wrongfully "advanced the reinspection deadline." The DHSS conducted its reinspection on April 21, 22, and 23,

---

subsequent reinspection." Such statement plainly demonstrates that the AHC had a clear understanding of Section 198.066's applicability to violations of the Act, as opposed to substantial noncompliance with the Act.

2009. In its plan of correction, Appellant stated that it would be in compliance by April 30, 2009. Yet, DHSS's approval of Appellant's plan of correction was accompanied by its advancement of the compliance deadline to April 10, 2009. Appellant apparently responded by informing the DHSS that compliance by April 10, 2009 was impossible because it had contractors scheduled to perform work at the Facility after that date. Appellant contends that, by conducting the reinspection prior to April 30, 2009, the DHSS interfered with its "right to select the date of [its] compliance."

While a facility is required to include "specific dates for achieving compliance" in its plan of correction, such dates must still be approved by the DHSS. § 198.026.2. Thus, Appellant did not have a right to set its compliance date, but rather an obligation to suggest one. Moreover, in the case of class II violations, the DHSS must give a facility at least forty days before it can conduct "*an unannounced* reinspection . . . to determine the status of all previously cited deficiencies." § 198.026.2 (emphasis added). In the instant case, the DHSS gave appellant more than two months to achieve compliance. Thus, Appellant had ample time to correct its violations. Finally, Appellant's argument is, again, irrelevant in that Appellant failed to show that it had corrected its violations by its requested compliance date of April 30, 2009. Points VIII and IX are denied. [16]

### Point X — Whether the AHC made an impartial decision

In its final point, Appellant enlarges the perceived conspiracy to include the AHC, contending that the AHC was partial to the DHSS and, thus, denied Appellant due

---

[16] Other *perceived* wrongs — which either (1) have already been discussed in this Court's opinion, or (2) are so vague and undeveloped that they cannot be addressed — include: the DHSS decided not to license Appellant before the February 2009 inspection was conducted, "interfered with business," caused Bob Elkow to resign, falsified SoDs, and made false statements during the AHC hearing.

process. Appellant presents eleven allegations of the AHC's favoritism toward the DHSS, but we need only address two of the allegations, as the remaining claims have been previously discussed in this opinion.

First, Appellant asserts that the AHC "thwarted default judgment for [Appellant]." Appellant filed its complaint with the AHC on May 29, 2009. On August 7, 2009, the DHSS filed a Motion for Leave to File Answer Out of Time, which the AHC granted. Appellant claims that the DHSS's "filing of the Answer was triggered by a telephone call from [the AHC] reminding [the DHSS] that it had yet to file an Answer." Appellant, however, does not provide any evidence of the AHC's alleged *ex parte* communication with the DHSS.

Second, Appellant asserts that the "AHC delayed holding a hearing more than one year after the filing of the complaint, and later delayed issuing the opinion for two more years, thereby causing serious economic harm to [Appellant]." Our review of the record indicates that the AHC did not delay holding the hearing. Rather, the AHC granted Appellant's Motion for Expedited Hearing Date. The fourteen-month period between the filing of Appellant's complaint and the AHC hearing was simply the amount of time it took for pre-hearing matters — which included several discovery related motions — to be completed. Moreover, Appellant has failed to show how the AHC's delay in issuing its decision caused Appellant "serious economic harm." And, now having labored our own way through Appellant's disorganized diatribe of meritless complaints, as well as the voluminous record on appeal, we fully understand the AHC's need to take longer than usual to render its 79-page decision. Point X is denied.

**CONCLUSION**

35

The circuit court's judgment is affirmed.

_____
Lisa White Hardwick, Judge

All Concur.